Anarian Chad JACKSON *v*. STATE of Arkansas

CA CR 03-730                                          158 S.W.3d 715

Court of Appeals of Arkansas
Division III
Opinion delivered April 14, 2004

*Jeremy B. Lowrey*; and *Hampton & Larkowski*, by *Jerry Larkowski*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Lauren Elizabeth Heil*, Ass't Att'y Gen., for appellee.

ANDREE LAYTON ROAF, Judge. Appellant Anarian Chad Jackson entered a conditional guilty plea to a charge of possession of a controlled substance with intent to deliver following the denial of his motion to suppress. For reversal, Jackson raises three points on appeal. He argues that: (1) his initial detention was an unconstitutional seizure; (2) his consent to search his bag was ineffec-

tive; and (3) the method by which he was Mirandized rendered the warnings ineffective such that his subsequent statements were illegally obtained. Because we agree with Jackson that his initial detention was illegal and that the trial court erred in denying his motion to suppress, we reverse the trial court's denial of the motion to suppress and remand for further proceedings. It is, therefore, unnecessary for us to address the other points raised by Jackson on appeal.

Detectives Kyle King and Mark Treece, members of the special narcotics operations unit, were working at the Little Rock Greyhound Bus Station, with the purpose of curtailing the flow of narcotics through the bus station. On June 21, 2001, at approximately 5:00 a.m., they, along with a drug canine, Rexie, were at the station. Treece and Rexie were positioned approximately five feet from the bus on which Jackson was a passenger. According to King, when Jackson exited the bus and noticed Treece and Rexie, he "hesitated" and moved the bag that he was carrying at his right side to the left side, "put[ting] the bag up real high as to keep the dog from smelling it." King clarified that Jackson did not place the bag on his shoulder, but rather than carrying it with the shoulder strap; he carried the bag "up high." He opined that this "took [the bag] out of reach of the canine." Treece also testified that as Jackson got off the bus, he picked his bag "up high." Jackson then walked to the bus station, but turned once to look back at Treece before·entering the station.

King and Treece, along with Rexie, approached Jackson, identified themselves as detectives with the Little Rock Police Department, displayed badges and ID cards, and asked to speak with him. Jackson cooperated and produced identification. The ID Jackson produced was for "Brady McCoy," an alias that King recognized as one used by Jackson. King stated that, although he did not recognize Jackson before stopping him, he knew Jackson was a person the department had been "hunting" and knew that he was dangerous. King also knew that Jackson had outstanding felony warrants for murder, aggravated robbery, and battery. King then asked Jackson if he was carrying any firearms or drugs, and Jackson denied that he was. King asked if he could search Jackson's bag. Jackson agreed, but then proceeded to open the bag himself. King testified that he then stated, "I didn't ask for you to search [the bag], I want myself to search it." Jackson set the bag on the floor and stepped back. According to the officers, King then told Jackson to lie face down on the ground, tackled Jackson to the floor, and placed him under arrest for obstructing government

operations by producing false identification. While King placed Jackson under arrest, Treece searched his bag after Rexie alerted on the bag, signaling the presence of drugs. Treece found two pounds of marijuana in the bag.

Jackson was transported to the Little Rock Police Department. While waiting to be interviewed by Detective J.C. White, Jackson commented to officers that he was an "OG." White then Mirandized Jackson, using the Little Rock Police Department's *Miranda* form, and took two taped statements regarding the battery, aggravated robbery, and murder charges. Jackson waived his rights three times during this interview.

Following that interview, Jackson was taken across the hall to be interviewed by Agents Cook and Sullivan. During the interview there were four officers present — J.C. White, Stuart Sullivan, DEA Special Agent Joe Cook, and ATF Special Agent Glen Cook. Cook informed Jackson that he wanted to speak with him about the drugs he was arrested with and reminded him that his Miranda rights were still in effect. Jackson again waived his rights. Sullivan took a handwritten statement in which Jackson discussed purchasing and trafficking cocaine and marijuana. The statement was read to him and Jackson acknowledged the veracity of the statement, making corrections and initialing them.

Jackson moved to suppress his statements and the evidence obtained after his arrest. At a hearing on his motion to suppress, Jackson argued that the facts did not establish reasonable suspicion sufficient to detain him. He also argued that Ark. R. Crim. P. 2.2 was not applicable in this case because the officers were not investigating a specific crime. The trial court ruled that the fact that the officers were "tipped off," coupled with Jackson's behavior, was sufficient to require cooperation under Rule 2.2. He also ruled that the production of false ID was sufficient to arrest and denied the motion to suppress.

On review from a denial of a motion to suppress evidence, the appellate court's review is *de novo*, making an independent determination based on the totality of the circumstances, giving due deference to the trial court's ability to assess the credibility of witnesses. *Davis v. State*, 351 Ark. 406, 94 S.W.3d 892 (2003).

Jackson first argues that his initial detention was an unconstitutional seizure because it was made without reasonable suspicion. Arkansas Rule of Criminal Procedure 3.1 authorizes a

police officer to stop and detain an individual who he reasonably suspects is committing, has committed, or is about to commit a felony, or a misdemeanor involving forcible injury to persons or property damage. Reasonable suspicion is defined as:

> A suspicion based on facts or circumstances which of themselves do not give rise to the probable cause requisite to justify a lawful arrest, but which give rise to more than a bare suspicion; that is, a suspicion that is reasonable as opposed to an imaginary or purely conjectural suspicion.

*Davis, supra.* The justification for the investigative stop depends on whether, under the totality of the circumstances, the police officer has specific, particularized, and articulable reasons indicating that the person may be involved in criminal activity. Further, only actions observed before the stop can be used as justification for the stop. *Stewart v. State,* 332 Ark. 138, 964 S.W.2d 793 (1998).

In *Meadows v. State,* 269 Ark. 380, 602 S.W.2d 636 (1980), the supreme court held that an officer violated Ark. R. Crim. P. 3.1 and 2.2 when he questioned two passengers merely because they looked back at the officer and quickened their pace. The court reversed the conviction, holding that the trial court should have suppressed the evidence that was seized. In that case, three plain-clothes officers were waiting at the Little Rock airport hoping to spot several persons suspected of transporting heroin. Meadows and another individual got off the plane and walked past the officers. They looked back at the officers, and the officers became suspicious. The two men looked back several times and the officers followed. One of the officers approached, identified himself, and asked for Meadows's identification. A police check revealed that there was a warrant for Meadows's arrest. Meadows was arrested and found in possession of heroin. The officer testified that he stopped the appellants because they were looking back in a suspicious manner and appeared nervous. The trial court found that there was nothing illegal about the appellants' conduct, but denied the motion to suppress.

On appeal, the supreme court disagreed. The court held that Rule 3.1 did not support the stop because the appellants' conduct in looking back could not possibly suggest that they had committed or were about to commit a crime. The supreme court concluded that the appellants' conduct in repeatedly looking back at the officers when they exited the plane and quickened pace

upon being followed did not support the reasonable suspicion needed to justify a stop under Rule 3.1. The court further held that Rule 2.2 did not provide justification because the officers were not investigating a specific crime. *See also Stewart, supra* (holding that the officer did not have reasonable suspicion to search the appellant because her actions before the officer approached her did not justify the stop).

■ We conclude that *Meadows, supra,* controls the disposition of this case. The conduct which Officers King and Treece used as justification for their approach and detention of Jackson amounts to three actions; (1) Jackson's startled look upon observing Treece and Rexie; (2) Jackson's shifting of the bag from his right side to "high" on his left side as he exited the bus; and (3) a single glance back at Treece and Rexie as he entered the bus station. These facts do not give rise to a reasonable suspicion that Jackson was committing or about to commit a crime, and thus do not justify a stop pursuant to Ark. R. Crim. P. 3.1. First, Treece, the officer responsible for Rexie, testified that Rexie is the type of dog that would sometimes make people nervous. Second, the supreme court has held that repeated glances back at law enforcement officers and a quickened stride are not indicative of criminal activity and do not justify a stop pursuant to Rule 3.1. *Meadows, supra.* In fact, there is no testimony that Jackson quickened his pace or changed his route in an attempt to avoid detection. Finally, shifting a bag from one side to the other is so common and innocuous an activity as to provide no suspicion of criminal activity whatsoever.

■ The second and alternative justification for the initial encounter may be made pursuant to Ark. R. Crim. P. 2.2. Pursuant to Rule 2.2, an officer may seek cooperation from an individual while investigating a crime. Ark. R. Crim. P. 2.2 (2003). Rule 2.2 authorizes an officer to request information from citizens where the approach does not rise to the level of a seizure and where the officer is requesting information or cooperation in aid of an investigation or the prevention of a crime. *Scott v. State,* 347 Ark. 767, 67 S.W.3d 567 (2002).

In *Stewart, supra,* the court held that the officer's stop of the appellant was not justified under Rule 2.2 because the officer was not investigating any particular crime. Thus, the supreme court reversed the trial court's denial of the motion to suppress. The

court noted that Rule 2.2 supported the officers' actions in *Hammons v. State*, 327 Ark. 520, 940 S.W.2d 424 (1997) and *Baxter v. State*, 274 Ark. 539, 626 S.W.2d 935 (1982), because the officers in those cases were investigating specific crimes.

In *Bernal v. State*, 48 Ark. App. 175, 892 S.W.2d 537 (1995), the appellant was arrested at a bus terminal for possession of marijuana. Police officers present at the bus station were monitoring passenger activity for narcotics trafficking. They used a drug-sniffing dog to detect the presence of narcotics in bags. They discovered narcotics in two bags, one blue and one black suitcase, under the bus. Subsequently, the officers found two bags containing marijuana on the bus. The appellant, a passenger on the bus, watched the officer and the drug dog; left the bus terminal with a Mr. Salinas; and returned to the bus terminal. The officer approached the appellant, requested identification, and noticed two keys in the appellant's wallet. The appellant stated that the keys were to his suitcase on the bus. An officer appeared with the black and blue suitcases, and the appellant identified the black suitcase as belonging to him.

The supreme court held that Rule 2.2 supported the police officer's actions. The court distinguished the case from *Meadows, supra*, noting that in *Meadows* the officers were not requesting the information in the course of a criminal investigation. In *Bernal, supra*, however, once the officers found narcotics on the bus they were in fact investigating a crime, and their subsequent stop of Bernal was a valid Rule 2.2 stop.

We conclude that Rule 2.2 likewise does not provide a basis for Jackson's stop. The trial court ruled that a police department "tip" and Jackson's conduct supported the initial detention under Rule 2.2. However, Detective King explicitly testified that he was not "tipped off" that Jackson was arriving at the bus station, and that his presence at the station was for the purpose of routine monitoring activities. Thus, the trial court erred in making the suppression ruling.

Further, only conduct occurring before the stop may properly be considered in the Rule 2.2 analysis. As discussed above under the Rule 3.1 analysis, Jackson's conduct was not indicative of any criminal activity. More importantly, King and Treece would have to have been investigating a specific crime for Rule 2.2 to justify Jackson's detention. Although King testified that he and Treece were at the bus station in an effort to slow down

the flow of drugs there, he did not state that he was investigating any *particular* crime, as required by *Stewart, supra,* and *Meadows, supra.* Accordingly, Rule 2.2 does not justify the stop and detention in this case. Because we are reversing the trial court on this point, all the evidence that was obtained as an immediate and direct result of Jackson's illegal stop should be suppressed as "fruit of the poisonous tree." Consequently, we need not address Jackson's remaining arguments. *Latta v. State,* 350 Ark. 488, 88 S.W.3d 833 (2002); *Keenom v. State,* 349 Ark. 381, 80 S.W.3d 743 (2001).

Reversed and remanded.

NEAL and VAUGHT, JJ., agree.