Anarian Chad JACKSON  *v.*  STATE of Arkansas

CR 03-800                                    197 S.W.3d 468

Supreme Court of Arkansas

Opinion delivered November 4, 2004

[Rehearing denied December 9, 2004.]

298

*Jeremy B. Lowrey*; and *Hampton & Larkowski*, by: *Jerry Larkowski*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.

Robert L. Brown, Justice. The appellant, Anarian Chad Jackson, appeals from his conviction for first-degree murder and his sentence of life imprisonment. We affirm the conviction and sentence.

The facts gleaned from the testimony at trial are these. On January 5, 2001, a witness observed Charles Raynor as he was shot to death in his front yard in Little Rock. The same witness had observed two men approach the victim from behind, at which time Raynor fell to the ground. When he tried to get up, Raynor

was shot again. The State's Chief Medical Examiner, Dr. William Sturner, testified at trial that Raynor was killed by a gunshot wound to the head.

Also at trial, the State presented testimony from Chris Bush, who had already pled guilty to first-degree murder for Raynor's murder and had received a sentence of forty years' imprisonment. Bush testified that Jackson had previously told him that Raynor "was talking about [Jackson] to little girls and stuff" and saying "things about [Jackson]," and that Jackson did not like it. Bush stated that the day of the murder, he and Jackson were being driven around by "Little Mark," a friend, when they saw Raynor standing in his front yard. Bush testified that he had a .357 revolver with him, and that Jackson was carrying a .40 caliber semi-automatic gun.

Bush testified that Jackson told Little Mark to park around the corner from the house, and that Bush and Jackson then got out of the car, went down the alley, and walked along the side of the house to where Raynor was standing. Bush said that Jackson started shooting first and that he himself shot about five times and then ran back to the car. He further testified that Jackson finished shooting and came running behind him. Bush admitted that when the police found him, he had the .40 caliber gun which was used to kill Raynor with him, which he had obtained from a "dope house."

The State also presented testimony from Officer Todd Hurd, a gang-intelligence detective with the Little Rock Police Department, who testified that Jackson was classified as both a "slinger" and a "banger." He defined the terms in front of the jury as follows:

> "Slinger" is a street term, or "slanger" as it's commonly referred to, is a person who deals dope. They're slinging dope on the streets. And a "banger" is a person that's referred — a gang member that is referred to as really being into the gang rivalries if you will; shooting at, having conflict with other gangs and other gang members.

He further stated that Jackson was a leader of the West Side Posse, also known as the West Side Piru, a gang in Little Rock, and that Raynor was a member of the Monroe Street Hustlers, another gang in the Little Rock area. He said that as a leader of the West Side Posse, Jackson would be the main authority figure over younger gang members, like Chris Bush, who would have been below Jackson in the gang's hierarchy.

Ronald Andrejack, a State Crime Lab firearms-and-tool-mark examiner, testified that four .40-caliber casings, which were

found at the scene of Raynor's death, were all fired from the .40-caliber weapon that was retrieved and that a piece of copper jacket from a .38-caliber bullet taken from Raynor's body could have been fired by a .357 Magnum, but not the .40-caliber pistol that fired the casings.

Two other witnesses for the State were treated as hostile witnesses. Markevious King and Rodrick Pennington testified that they did not remember giving statements to Detective Stuart Sullivan of the Little Rock Police Department. When they testified they were unable to remember their statements, the State sought and obtained from the circuit court the permission to introduce into evidence transcripts of both witnesses' testimony before a federal grand jury. King's testimony affirmed a statement he had given to Detective Sullivan in which he named the members of the West Side Posse and discussed times when Jackson gave guns to other gang members and to him and directed them to seek out members of the Monroe Street Hustlers. Pennington's grand-jury testimony affirmed his statement to Detective Sullivan that Jackson had rewarded Bush for shooting Raynor by giving him a car.

Takesha Griffin, Jackson's first cousin, was also called to testify by the State and was treated as a hostile witness. She denied that she gave a statement to police regarding Jackson's involvement in Raynor's death. She stated that she was high on crack at the time of the statement and that she was kept at the Little Rock Police Department for five or six days. She added that she was willing to say or do anything to leave the department. Her testimony before the federal grand jury was also introduced into evidence. The State then called Detective Eric Knowles of the Little Rock Police Department, who took Ms. Griffin's statement. He testified that her statement was taken under oath, which was administered by a deputy prosecutor. An audio tape of Ms. Griffin's statement was admitted into evidence and played for the jury. In that statement, Ms. Griffin testified that Jackson admitted killing Raynor with Bush, because Raynor had supposedly tried to kill Jackson at least four times. She further stated that she had heard on the street that Jackson and Raynor had wanted the same girl. In addition, she told the detective that Jackson told her he had "a .44" and that Bush had "the .357" at the time of the shooting.[1]

---

[1] Ms. Griffin refers to a ".44" caliber, but throughout the rest of the State's case the gun is referred to as a ".40" caliber.

Detective Knowles testified that Ms. Griffin was not under arrest at the time of her statement and was free to leave and that she appeared very friendly and cooperative the entire time. Detective John White, of the Little Rock Police Department, who was also present at the time of Ms. Griffin's statement, testified that he observed no symptoms of drug withdrawal at the time of her statement. Finally, Detective Sullivan testified that after Jackson was Mirandized, he admitted to being the "top guy" in the West Side Posse. Jackson was convicted of murder and sentenced as already noted in this opinion.

## I. Gang Expert

Jackson argues, as his first point on appeal, that the prosecutor's introduction of testimony from Officer Todd Hurd, the purported gang expert, amounted to no more than a character assassination. He claims specifically that the testimony fails to meet the reliability standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and that its admissibility violated his rights to due process and a fair trial. He contends that the State should have been required to present testimony from an expert with sociological or other comparable training and education that would provide some assurance of both unbiased and well-grounded conclusions, after employing valid data-gathering techniques. Jackson further maintains that Officer Hurd's testimony was based on rumor and hearsay and should have been excluded as improper, highly prejudicial character evidence that compromised the reliability of the jury's fact finding. He concludes that his Sixth and Fourteenth Amendment rights were violated.

### a. Standard of Review

In *Brunson v. State*, 349 Ark. 300, 79 S.W.3d 304 (2002), this court summarized its standard of review for the qualification of experts:

> Whether a witness qualifies as an expert in a particular field is a matter within the trial court's discretion, and we will not reverse such a decision absent an abuse of that discretion. Rule 702 of the Arkansas Rules on Evidence entitled "Testimony of Experts" reads: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an

opinion or otherwise." We have said that if some reasonable basis exists demonstrating that the witness has knowledge of the subject beyond that of ordinary knowledge, the evidence is admissible as expert testimony.

349 Ark. at 309, 79 S.W.3d at 309 (internal citations omitted).

## b. *Reliability under* Daubert *and* Kumho Tire

Jackson maintains that while this court has previously addressed the admissibility of gang-expert testimony under the rubrics of relevance and prejudice, such evidence has never been evaluated by this court for its reliability under *Daubert*.

Jackson is correct that this court has not previously evaluated a gang expert's reliability under *Daubert*. In *Farm Bureau Mut. Ins. Co. v. Foote*, 341 Ark. 105, 14 S.W.3d 512 (2000), we adopted the holding of the United States Supreme Court in *Daubert* and the inquiry to be conducted by a trial court. We concluded, in accordance with *Daubert*, that the trial judge, when presented with a proffer of expert scientific evidence, must initially decide if the reasoning behind the evidence is scientifically valid and can be applied to the facts of the case. We noted several criteria to be used by the judge in making that decision.

This court later observed that Arkansas Rule of Evidence 702's requirements apply equally to all types of expert testimony and not simply to scientific expert testimony, citing to *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). *See Coca-Cola Bottling Co. v. Gill*, 352 Ark. 240, 100 S.W.3d 715 (2003). In *Kumho Tire*, the United States Supreme Court concluded that the trial court's general "gatekeeping" obligation, as prescribed under *Daubert*, applies to all expert testimony when assessing the reliability of that testimony. The Court added that in assessing reliability, the trial court may, at its discretion, consider the *Daubert* factors to the extent relevant. The standard of review would be abuse of discretion.

In the instant case, we conclude that it was not necessary for the circuit court to engage in a *Daubert* or *Kumho Tire* analysis of the particular questions relating to reliability outlined in Jackson's brief.[2] As the Ninth Circuit Court of Appeals observed in a similar

---

[2] Jackson outlines the following questions in his brief:

case involving testimony by a police gang expert, the *Daubert* factors are simply inapplicable to this kind of testimony which is based on the experiences and the knowledge garnered by the expert. *See United States v. Hankey*, 203 F.3d 1160 (9th Cir. 2000).

■ Accordingly, we agree with *Kumho Tire* that whether a trial court relies on the specific factors outlined in *Daubert* is within the circuit court's discretion and depends on the facts of the case. In the case before us, the circuit court did not employ the *Daubert* criteria, but Officer Hurd testified that he had been working in the gang intelligence unit of the Little Rock Police Department since 1995 and had personally interviewed over 300 gang members. He added that he had personally documented gang tattooing and graffiti and was personally familiar with the locations of the gangs and their rivalries. He had also been qualified as a gang expert in other courts of law. Because Officer Hurd's testimony was premised upon his personal experiences in dealing with gangs over a number of years, it differs from expert testimony which rests purely on a scientific foundation. We conclude that the circuit court did not abuse its discretion in failing to conduct a *Daubert* analysis to determine the reliability of Officer Hurd's testimony. Moreover, the circuit court did not abuse its discretion by ruling that the testimony was reliable based on Officer Hurd's knowledge and experiences.

*c. Prejudicial Nature*

Jackson goes further, however, and urges that even if Officer Hurd's knowledge and experience render his testimony reliable, his testimony should not have been permitted because it consisted of hearsay and inadmissible evidence regarding Jackson's character, particularly as it related to his reference to Jackson as a "slinger" and a "banger." He maintains that this testimony violated his right

---

1. Whether a "theory or technique . . . can be (and has been) tested";

2. Whether it "has been subjected to peer review and publication";

3. Whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation";

4. Whether the theory or technique enjoys " 'a general acceptance' " within a " 'relevant scientific community.[' "]

to a fair and impartial trial by jury under the Sixth and Fourteenth Amendments. Indeed, he claims that his trial was tainted at the outset by the "slinger" and "banger" references.

This court has previously recognized the utility of testimony by a gang expert. In *Johninson v. State*, 317 Ark. 431, 878 S.W.2d 727 (1994), we observed that where the relevance of such testimony has been demonstrated, expert testimony on the membership, organization, purposes, and conduct of particular street gangs may be admissible. Having said that, this court went further in *Johninson* and affirmed the circuit court's denial of the defendant's proffered testimony from a gang expert. We noted that "[t]he broad overview of the urban gang subculture that the prospective expert witness provided . . . had no direct, particular reference to the victim and his associate." 317 Ark. at 439, 878 S.W.2d at 731. Hence, the reason we concluded the gang testimony was not relevant in that instance was it made no reference to the parties in that case.

This court has observed that evidence of other crimes, wrongs, or acts may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *See, e.g., Anderson v. State*, 357 Ark. 180, 163 S.W.3d 333 (2004). *See also* Ark. R. Evid. 404(b). The admission or rejection of evidence under Rule 404(b) is committed to the sound discretion of the trial court, and this court will not reverse absent a showing of manifest abuse of that discretion. *See id.* As this court recently said in *Morris v. State*, 358 Ark. 455, 193 S.W.3d 243 (2004), any circumstance that ties a defendant to the crime or raises a possible motive for the crime is independently relevant and admissible as evidence. The fact that the two gangs at issue had been in a strong rivalry and had been going "back and forth" over females, as testified to by Officer Hurd, certainly seems relevant to Jackson's motive in killing Raynor. Nevertheless, Officer Hurd's testimony that Jackson was a "slinger" and a "banger" undoubtedly was harmful to Jackson. The question, though, is whether this unfair prejudice outweighs the probative nature of his testimony. *See* Ark. R. Evid. 403; *Branstetter v. State*, 346 Ark. 62, 57 S.W.3d 105 (2001).

Other jurisdictions have reached different results in comparable situations. *See State v. Agotte*, 146 N.H. 544, 776 A.2d 715 (2001) (testimony in arson prosecution that defendant had reported a prior fire with insinuations in argument that defendant stated the prior fire was used to establish propensity and deemed

extremely prejudicial); *People v. Ellis*, 315 Ill. App. 3d 1108, 735 N.E.2d 736 (2000) (evidence defendant was gang member is relevant to show common design, purpose, or motive where victim was rival gang member and was shot to death while selling drugs); *State v. Torres*, 47 Conn. App. 149, 702 A.2d 142 (1997) (evidence defendant was member and leader of gang was relevant in his conspiracy-to-commit-murder trial for shooting death of rival gang member; prejudice did not outweigh probative value); *People v. Mason*, 274 Ill. App. 3d 715, 653 N.E.2d 1371 (1995) (testimony defendant was a regent and a regent was responsible for selling drugs and hiding weapons inflamed jury against defendant and was irrelevant); *Commonwealth v. Scarfo*, 416 Pa. Super. 329, 611 A.2d 242 (1992) (repeated comments by prosecutor to the jury that defendants were "made" members of the Mafia, which meant they had been involved in killings, was not merely testimony to establish motive but so tainted the jury that it could not render a fair verdict; this was reversible error); *Perryman v. State*, 798 S.W.2d 326 (Tex. Ct. App. 1990) (expert testimony that defendant was an experienced rapist in a rape trial was inflammatory and prejudicial and this clearly outweighed any probative value); *People v. Washington*, 127 Ill. App. 3d 365, 468 N.E.2d 1285 (1984) (investigator's comment to trial court at sentencing hearing that defendant was a gang leader based on information from an unnamed informant was hearsay and unreliable and warranted a new sentencing hearing).

We conclude that it was an abuse of discretion for the circuit court to allow Officer Hurd to testify that Jackson was a "slinger" and a "banger." Nonetheless, we also conclude that duplicate testimony was presented to the jury through federal grand-jury transcripts that clearly established that Jackson was indeed a "banger," that is, someone involved in gang killings. King testified before the federal grand jury that in the year 2000, Jackson gave multiple orders to West Side Posse gang members to shoot members of the Monroe Street Hustlers. Pennington testified before the federal grand jury that Jackson awarded points for head shots of rival gang members, ordered four shootings, and gave two rewards to two gang members for shootings, including the car to Bush.

Markevious King also testified before the federal grand jury that Jackson was the leader of the West Side Posse and that King started selling cocaine for the gang at age fourteen. Takesha Griffin testified before the federal grand jury that Jackson called himself

the leader of the West Side Posse, and in answer to a question by a member of the grand jury, agreed that the gang was involved in drugs. Transcripts of this grand-jury testimony were admitted into evidence. In addition, Chris Bush testified that one of the guns used in the killing came from a West Side Posse "dope house." All of this evidence is cumulative to Todd Hurd's description of Jackson as a "slinger."

■ Accordingly, we hold that any error occasioned by the circuit court's allowance of Officer Hurd's reference to Jackson as a slinger or banger was rendered harmless beyond a reasonable doubt by the admission of subsequent testimony. *See, e.g., Gaines v. State*, 340 Ark. 99, 8 S.W.3d 547 (2000) (no prejudice results where evidence erroneously admitted was merely cumulative); *Criddle v. State*, 338 Ark. 744, 1 S.W.3d 436 (1999) (under *Chapman v. California*, 386 U.S. 18 (1967), the rule is when a constitutional issue is involved, but evidence of guilt is overwhelming and the error slight, we can declare the constitutional error harmless so long as it is harmless beyond a reasonable doubt).

## II. Pennington Grand-Jury Transcript

Jackson claims, as his next point, that the admission of Rodrick Pennington's grand-jury testimony at the jury trial violated Arkansas Rules of Evidence 801 and 802, as well as the Confrontation Clause of the Sixth Amendment of the United States Constitution. He maintains that this is because there was no underlying foundation laid for Pennington's knowledge about Jackson's gang activities and, as a result, his testimony is hearsay and inadmissible under Rule 802. Jackson further contends that Pennington's grand-jury statements were highly prejudicial, both because of their unsubstantiated references to other gang shootings set in motion by him and for the claim that Jackson rewarded Bush with a car for shooting Raynor.

The State responds that Jackson did not object based on hearsay until after Pennington's grand-jury testimony was already admitted into evidence. It further asserts that Jackson did not make any argument below that the evidence at issue was secondary hearsay, as he does now on appeal. For these reasons, the State claims that Jackson did not object at the first opportunity and, in addition, has changed his grounds for objection on appeal. Thus, the State maintains his argument is not preserved for appellate review. The State further submits that the grand-jury testimony was properly admitted as substantive evidence.

*a. Preservation*

We conclude that the hearsay issue is preserved for our review. At the close of the State's redirect examination of Pennington, the prosecutor sought to admit Pennington's grand-jury testimony and stated that he would substitute a redacted copy of it. Upon giving defense counsel Pennington's redacted grand-jury testimony on the morning of December 12, 2002, the prosecutor noted that while he did not believe defense counsel had any objections to its content, "[w]e provided it to him for review as the Court directed, and so I guess it's up to him to make his objections to that." The circuit court agreed, saying: "He can do that, and co-counsel might can assist him while he's focusing on those things to make sure that we get as specific as we can be on all of those." It was not until some time later, when the State was about to rest, that defense counsel made a hearsay objection to Pennington's grand-jury testimony. At that time, defense counsel raised the "outstanding hearsay objection on Rodrick Pennington." Defense counsel argued that the State had failed to establish a foundation for certain statements made in Pennington's testimony before the federal grand jury. The circuit court overruled the objection.

■ Our review of the record demonstrates that the circuit court certainly planned on entertaining objections to the redacted version of the grand-jury testimony following its original admission. Because it appears that Jackson's counsel objected in a timely fashion with the concurrence of the trial judge and prosecutor after receiving the State's redacted version, we conclude that the issue is preserved for review.

■ The State further objects to the hearsay issue on the basis that Jackson has changed his argument on appeal. According to the State, no objection to secondary hearsay was made at trial. It is elementary that an appellant cannot change his argument on appeal and that he is limited to the scope and nature of the argument made below. *See Hunter v. State*, 330 Ark. 198, 952 S.W.2d 145 (1997). We disagree that Jackson has changed his argument. It appears to this court that Jackson maintained both at trial and now on appeal that no foundation was laid as to how Pennington got the information about Jackson to which he testified, even though he uses the terms classic hearsay and secondary hearsay interchangeably. Hence, we conclude the issue was preserved.

Turning to the merits, Arkansas Rule of Evidence 801(d)(1) defines one type of statement that is not hearsay:

> (d) *Statements Which Are Not Hearsay.* A statement is not hearsay if:

> (1) *Prior Statement by Witness.* The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (i) inconsistent with his testimony and, if offered in a criminal proceeding, was given under oath and subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a disposition [deposition], or (ii) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive, or (iii) one of identification of a person made after perceiving him[.]

Ark. R. Evid. 801(d)(1).

■ In the case before us, Pennington testified at Jackson's trial and was subject to cross-examination by Jackson's counsel concerning his grand-jury statements. Clearly, his grand-jury testimony was inconsistent with his testimony at Jackson's trial, because at the trial, he denied ever giving a statement to police officers or having any knowledge of events which he had previously discussed with those same officers. Because his grand-jury testimony belied his lack of knowledge of events and because it was given under oath and was subject to the penalty of perjury at another proceeding and because Pennington was subject to cross-examination at Jackson's trial, we hold that his grand-jury testimony did not qualify as hearsay under Rule 801(d)(1).

### III. Confrontation Clause

Jackson next urges that the out-of-court statements that Pennington and Markevious King made to the grand jury, as well as the statements made by Ms. Griffin to the grand jury and her sworn statement to the police, all of which were admitted at trial, lacked any indicia of reliability and failed to fall within the exception to the hearsay rule that would have made their admissibility constitutionally permissible. He urges this court to overturn its prior decision in *Jones v. State*, 283 Ark. 308, 675 S.W.2d 825 (1984), based on the United States Supreme Court's decision in *Lilly v. Virginia*, 527 U.S. 116 (1999). He argues that there is no

distinction between the statements admissible under *Jones* and under Arkansas Rule of Evidence 801(d)(1) and those found inherently unreliable in *Lilly*. He goes further and maintains that while Pennington, Markevious King, and Ms. Griffin were available for cross-examination, that examination is not meaningful when the declarants are now professing no knowledge of the events to which the prior statement alluded. Jackson asserts that the prejudice is clear and that without the statements in question, there was no corroboration of Bush's accomplice testimony.

Jackson's argument is not well-taken. In *Jones v. State, supra,* this court examined Jones's argument that the transcript of one of the State's witness's prior testimony was not admissible. In that case, Jones and Dennis Williams were jointly charged with burglary and aggravated robbery. Williams was tried and convicted first, and he testified at his own trial. When called to testify at Jones's trial by the State, he refused to testify against Jones. The circuit court permitted the State to introduce the transcript of Williams's earlier testimony. On appeal, Jones argued that Williams's prior testimony was inadmissible. This court disagreed and affirmed the ruling of the circuit court. We noted that since the General Assembly had adopted the Uniform Rules of Evidence, "such prior sworn statements are now admissible as substantive evidence in criminal cases." 283 Ark. at 311, 675 S.W.2d at 826. We further observed that Rule 801(d)(1) required the declarant to be subject to cross-examination at the *later* trial, as Williams was, and that his testimony be inconsistent with his earlier testimony. The court then noted its agreement with the view taken by the federal courts that the trial court has considerable discretion in determining whether testimony is "inconsistent" with prior statements, and that inconsistency is not limited to diametrically-opposed answers, "but may be found in evasive answers, inability to recall, silence, or changes of position." *Id.*, 675 S.W.2d at 827 (quoting *United States v. Russell,* 712 F.2d 1256 (8th Cir. 1983)).

This court does not lightly overrule cases and applies a strong presumption in favor of the validity of its prior decisions. *See, e.g., Echols v. State,* 354 Ark. 414, 125 S.W.3d 153 (2003). Further, as a matter of public policy, this court has said that it is necessary to uphold its prior decisions unless a great injury or injustice will result. *See id.* We have also made it clear that it is the appellant's burden to show that this court's refusal to overrule a prior decision will result in great injustice or great injury. *See Stivers v. State,* 354 Ark. 140, 118 S.W.3d 558 (2003). In the instant case, Jackson

requests the court to overrule *Jones v. State, supra,* in light of the United States Supreme Court's decision in *Lilly v. Virginia, supra.* We decline to do so, because the *Lilly* case is distinguishable.

In *Lilly,* the Court discussed an accused's rights under the Confrontation Clause. During Lilly's trial, his brother Mark, a participant in the crimes charged, was called to testify by the Commonwealth of Virginia. Mark invoked his Fifth Amendment privilege against self-incrimination at trial, and the Commonwealth offered into evidence statements Mark had made to police following his arrest. The statements were admitted, and Lilly was convicted. The Virginia Supreme Court affirmed his conviction, holding "that Mark's statements were declarations of an unavailable witness against penal interest; that the statements' reliability was established by other evidence; and therefore, that they fell within an exception to the Virginia hearsay rule." 527 U.S. at 122. The Virginia Supreme Court further ruled that where the hearsay has sufficient guarantees of reliability so as to come within an exception to the hearsay rule, the Confrontation Clause is satisfied.

The United States Supreme Court disagreed. It announced that the "decisive fact, which we make explicit today, is that accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." *Id.* at 134. The Court alluded to its prior holding that to be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant "must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." *Id.* at 138 (quoting *Idaho v. Wright,* 497 U.S. 805, 822 (1990)). The Court specifically rejected the Commonwealth's proffered basis of reliability, which was that Mark had been informed of his *Miranda* rights and that Mark knew he was exposing himself to criminal liability if he perjured himself. The Court said: "It is abundantly clear that neither the words that Mark spoke nor the setting in which he was questioned provides any basis for concluding that his comments regarding petitioner's guilt were so reliable that there was no need to subject them to adversarial testing in a trial setting." *Id.* at 139. The Court concluded that the admission of Mark's untested statement to police officers violated Lilly's rights under the Confrontation Clause.

Again, the *Lilly* case is easily distinguishable. At issue there was an unsworn statement that was given to police officers

while Mark was in custody. In the instant case, each of the witnesses' grand-jury testimony was given under oath and, thus, had the indicia of reliability required under *Lilly*. In addition, Ms. Griffin's statement to police officers was also given under oath. Moreover, Jackson was able to cross-examine the State's witnesses during his trial. Despite the fact that the witnesses claimed to have no memory of the events previously testified to, Jackson was able to confront them. Hence, his rights under the Confrontation Clause were not impaired. For these reasons, we decline Jackson's invitation to overturn *Jones v. State, supra.*

### IV. Model Accomplice Instructions

Jackson next advances the argument that the circuit court erred in rejecting his proposed limiting instructions relating to the designation of Bush as an accomplice. He asserts that when the circuit court so designated Bush, thus requiring corroborative evidence, that designation, together with AMI Crim. 2d 401, made Jackson strictly liable for the actions of Bush. Jackson concludes that the failure to give his proposed limiting instruction resulted in a deprivation of his fundamental right to trial by jury.

Jackson proffered the following instruction:

> The designation of Chris Bush as an accomplice is an evidentiary ruling only and does not in any way relieve you of your responsibility to determine independently whether the State has proved beyond a reasonable doubt that Anarian Jackson was an accomplice of Chris Bush.

That proffered instruction was refused by the circuit court.

The Jackson jury was, however, instructed as follows, in accord with AMI Crim. 2d 401:

> In this case, the State does not contend that Anarian Chad Jackson acted alone in the commission of the offense of Murder in the First Degree. A person is criminally responsible for the conduct of another person when he is an accomplice in the commission of the offense.
>
> An accomplice is one who directly participates in the commission of an offense or who, with the purpose of promoting or facilitating the commission of an offense:

> Solicits, aides (sic), encourages or coerces the other person to commit the offense; or
>
> Aids, agrees to aid, or attempts to aid the other person in planning or committing the offense.
>
> A person acts with purpose with respect to his conduct, or a result thereof, when it is his conscious object to engage in conduct of that nature or to cause such a result.

Jackson claims that it is the second sentence of this instruction, given together with the declaration that Bush was an accomplice, which renders Jackson strictly liable for Bush's actions. That is incorrect.

It appears that Jackson is misreading the model instruction given, although, admittedly, his argument is somewhat unclear. He apparently reads the second sentence of AMI Crim. 2d 401 to say: "[Jackson] is criminally responsible for the conduct of [Bush] when [Bush] is an accomplice in the commission of the offense." It is clear to us, however, that the sentence should be read: "[Jackson] is criminally responsible for the conduct of [Bush] when [Jackson] is an accomplice to the commission of the offense."

In addition to AMI Crim. 2d 401, AMI Crim. 2d 404 was given, which provides, in part, that if the jury finds that Jackson was only present while a crime was being committed, and did not have a legal duty to act, then he is not an accomplice. We have no doubt that the jury was fully instructed that it was its task to determine whether Jackson was an accomplice. That determination was not preordained by virtue of the instructions given.

■ This court has made it perfectly clear that non-model jury instructions are to be given only when the circuit court finds that the model instructions do not accurately state the law or do not contain a necessary instruction on the subject at hand. *See, e.g., Hill v. State,* 318 Ark. 408, 887 S.W.2d 275 (1994). Here, the model jury instruction accurately states the law. *See Calloway v. State,* 330 Ark. 143, 953 S.W.2d 571 (1997) (rejecting appellant's "mere presence" proffered instruction and holding that AMI Crim. 2d 401 accurately and completely reflects the law of accomplice liability). We hold that the circuit court did not err in rejecting Jackson's proposed instruction.

### V. Accomplice As Accessory After the Fact

Jackson argues next that AMI Crim. 2d 401 defines accomplice as "one who directly participates in the commission of an offense" and that this omits any scienter requirement. He claims, moreover, the model instruction places no time limitation on the requisite "purpose" set out in the second half of the sentence in the model instruction.

We disagree. It is boilerplate law in Arkansas and memorialized in our model instruction that to be an accomplice, one has to participate directly in the commission of the offense or with the purpose of facilitating or promoting the commission of the offense, solicit, aid, encourage, or coerce its accomplishment. Jackson argues certain hypothetical situations that are not relevant to this case or persuasive. His first hypothetical concerns a situation where a driver of a car removes robbers from the scene without knowing that a robbery had occurred. Those facts are far afield from the case at hand. Jackson's second scenario concerns a person who arrives after a murder and assists in cleaning up the crime scene. That scenario also is not relevant to the case presently before us.

■ To repeat, this court has held that a model jury instruction *shall* be used unless the circuit court concludes that it does not accurately state the law. *See Moore v. State*, 317 Ark. 630, 882 S.W.2d 667 (1994). Because Jackson has failed to demonstrate that the model instructions given do not accurately state the law, the circuit court did not err in instructing the jury as it did.

### VI. Improper Seizure and Suppression of Statements

For his final point, Jackson contends that the circuit court erred in ruling that his initial detention was a permissible seizure and supported by reasonable suspicion of criminal activity. This is especially so, he maintains, where the police officers did not know who Jackson was at the time he was stopped. Jackson asserts that his stop constituted a detention and that both the show of authority and the threat of force by a drug dog led to a seizure. He maintains that these circumstances, together with the clear intent of the police to detain him, led him to believe that he was not free to leave. In sum, he claims that he had a reasonable expectation of privacy and that there must be facts that give rise to an articulable or reasonable suspicion of criminal conduct for a permissible stop to transpire. He concludes that because the stop in his case constituted an unconstitutional seizure, his subsequent interrogation should be excluded on this basis.

In reviewing the denial of a motion to suppress a statement, this court has relied on the following standard of review:

> In reviewing the trial court's denial of a motion to suppress evidence, we conduct a *de novo* review based on the totality of the circumstances, reviewing findings of historical fact for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court and proper deference to the trial court's findings. *See Cummings v. State*, 353 Ark. 618, 110 S.W.3d 272 (2003); *Davis v. State*, 351 Ark. 406, 94 S.W.3d 892 (2003).

*Romes v. State*, 356 Ark. 26, 43, 144 S.W.3d 750, 761 (2004).

At the suppression hearing before the circuit court, Detective Kyle King of the Little Rock Police Department testified that he was working for the interdiction squad at the Greyhound Bus Station. Detective King stated that he was there along with Detective Mark Treece, who was present with a drug dog named Rex. Detective King testified that he knew Jackson used the bus station and that it was "highly probable" that they would see him there. Detective King testified that when Jackson got off the bus and saw Detective Treece and Rex, he appeared startled and seemed to hesitate. Detective King added that initially Jackson was carrying his black bag at his right side, but that as he stepped off the bus, he moved the bag to his left side, putting the bag "up real high as to keep the dog from smelling the bag." The detective then elaborated on this, stating that when Jackson carried his bag up high, it would have been about where the bag would be if it had had a shoulder strap attached to it. The detective further testified that as Jackson walked toward the bus station from the bus, he turned and looked back at Detective Treece and Rex before he went inside the station.

At that point, Detective King stated that he decided to speak with Jackson. He testified that he approached him, identified himself as a police officer, showed Jackson his badge, and asked if he could speak with him, to which Jackson responded "sure." Detective King testified that Jackson was very cooperative and, upon request, presented identification that he was "Brady McCoy." At that point, the detective stated, he knew that McCoy was an alias used by Jackson and that he knew Jackson used the bus station. Detective King was also aware that Jackson had several

outstanding felony warrants. He testified that prior to Jackson's giving him his identification, he did not recognize Jackson.

Detective King added that knowing Jackson could possibly be dangerous based on information he had been given, he asked Jackson if he was carrying any drugs or guns in his bag. According to the detective, Jackson responded "no." The detective then asked if he could search the black bag. Jackson agreed, and Detective King testified that Jackson began to search his own bag. The detective said that after telling Jackson that he wanted to search the bag himself, Jackson put the bag on the ground and stepped away from it. The detective stated that at this time, he tackled Jackson and placed him under arrest.[3]

Detective Treece also testified at the suppression hearing. He stated that he and Rex were standing just outside the door of the bus when Jackson came off the bus. He testified that Jackson appeared startled when he saw them, and that he stepped off the bus, picked his bag up high, and went around the door of the bus. Detective Treece testified that as Jackson went into the bus station, he glanced back at him and made eye contact. The detective further stated that Rex was not growling or barking when Jackson exited the bus. He stated that he was with Detective King when he asked Jackson for permission to search his bag, and that until Jackson was on the ground, he did not know who Jackson was.

The circuit court denied the suppression motion and ruled:

> I think given the fact that they'd been tipped off that he was coming in and the behavior that the officers noted would be sufficient given the — given those two things, the tip-off coupled with the behavior and the way that he held the bag. That would be sufficient to seek cooperation under rule two point two. And then the false identification would be sufficient to go further with an arrest at that point actually for obstructing governmental operations since they were already alerted to the name that — according to their testimony, this name Brady McCoy that was being used by the

---

[3] Rex later alerted to drugs inside Jackson's bag, but that is not pertinent for purposes of the present appeal, and in fact, was the subject of a separate appeal to the court of appeals. See Jackson v. State, 86 Ark.App. 39, 158 S.W.3d 715 (2004). In that case, the court of appeals suppressed the drugs. This court declined to review that decision by the court of appeals. The issue in the instant case is whether the stop was improper and whether his subsequent statement about his leadership in the gang should be suppressed.

person that they were seeking. So, your motion to suppress the evidence and the statement will be denied.

Jackson filed a motion for reconsideration, and the circuit court denied that motion as well.

Jackson claims on appeal that he was confronted by plain-clothes policemen, one of whom had an apparent attack dog, and the officers did not simply ask questions, but also asked him for identification. This, he maintains, created an implicit threat of force and show of authority which gave him the impression that he was not free to leave and he was, in fact, "seized."

In *United States v. Drayton*, 536 U.S. 194 (2002), the United States Supreme Court observed that "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." 536 U.S. at 200. The Court said that "[e]ven when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage — provided they do not induce cooperation by coercive means." *Id.* at 201. Importantly, "[i]f a reasonable person would feel free to terminate the encounter, then he or she has not been seized." *Id.*

This court has previously observed that not all personal conversation between policemen and citizens involves a "seizure" of a person under the Fourth Amendment. *See Thompson v. State*, 303 Ark. 407, 797 S.W.2d 450 (1990). Instead, we noted that a "seizure" occurs when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen. *See id.* That being said, this court has also previously held that where there was nothing in the police officer's testimony to support a belief that the police officer asked the appellant for identification in the course of a criminal investigation, Ark. R. Crim. P. 2.2 did not render the stop permissible. *See Meadows v. State*, 269 Ark. 380, 602 S.W.2d 636 (1980). *See also* Ark. R. Crim. P. 2.2(a) ("A law enforcement officer may request any person to furnish information or otherwise cooperate in the investigation or prevention of crime. The officer may request the person to respond to questions, to appear at a police station, or to comply with any other reasonable request."). In short, it appears that our Rule 2.2(a) requires that police officers may only request informa-

tion in connection with an "investigation or prevention of crime" which appears to be more restrictive than the Court's holding in *United States v. Drayton, supra.*

In *Meadows*, police officers were at the Little Rock Airport in hope of spotting several white males reported to be transporting heroin. They observed the appellant and a companion walking through the concourse. Meadows and his friend walked past the officers and "started looking back, which aroused the officers' suspicion." 269 Ark. at 381, 602 S.W.2d at 637. One of the officers began to follow the men and while being followed, Meadows and his friend "kept looking back occasionally" and their pace quickened. *Id.*, 602 S.W.2d at 637. After being approached and asked by the police officer, Meadows presented him with identification. After releasing Meadows, word came back to the officers that there was a felony warrant out for Meadows, and he was arrested and heroin was found in his possession. One of the officers testified that he only followed Meadows, because he looked back in a suspicious manner. This court then reversed the circuit court's denial of the suppression motion and held that Rule 2.2(a) was inapposite because the stop was not part of an investigation or prevention of a crime.

In the instant case, Jackson appeared startled and hesitant when he got off the bus and saw the police dog. He immediately switched his bag to his other arm and lifted it up high. He then entered the bus station and turned to look back at the police officer and the dog. The police officers were at the bus station with the drug dog for drug interdiction. This was not a police stop where the person stopped was simply standing in the wrong place at the wrong time. *See Stewart v. State*, 332 Ark. 138, 964 S.W.2d 793 (1998). Nor is it a case where the police officer was not investigating crime at the time of the stop. *See id.* Here, the police officers were at the bus station to investigate crime and specifically drug offenses. Detective King testified that the interdiction squad's purpose was to "attempt to slow down and stop the flow of drugs going through our city and to our city." They stopped Jackson as part of that investigation and asked for his I.D. Jackson cooperated.

Jackson's nervous demeanor and the fact that he shifted his bag away from the drug dog were objective reasons for the police officers to stop him and request his identification under Rule 2.2, even though they did not know at that point who Jackson was. *See* Ark. Code Ann. § 16-81-203(1), (13) (1987). In sum, these facts distinguish this case from *Meadows v. State, supra.*

We do not agree with Jackson that the police officers had to be investigating him for a specific crime in order to stop him and ask that he identify himself.

We hold that the stop and request for identification did not constitute an impermissible seizure. To the extent *Jackson v. State*, 86 Ark. App. 39, 158 S.W.3d 715 (2004), is inconsistent with this opinion, we overrule it.

A search of the record has been conducted pursuant to Supreme Court Rule 4-3(h), and no reversible error has been found.

Affirmed.

HANNAH, J., dissents.

JIM HANNAH, Justice, dissenting. I respectfully dissent. I disagree with the majority's holding that "any error occasioned by the circuit court's allowance of Officer Hurd's testimony to Jackson as a slinger or banger was rendered harmless beyond a reasonable doubt by the admissibility of subsequent testimony." The State sought to prove that Jackson was a gang member who, consistent with the character traits of gang members, shot his rival gang member Raynor. To show this character trait, the State put on Officer Hurd, an expert in gang behavior, who first defines the terms "slinger" and "banger." Next, when asked whether Jackson is classified as a slinger or a banger, Officer Hurd replies: "Chad *is both. He's done both.*" Defense counsel objected. The circuit court concluded that Officer Hurd:

> has the right to testify as an expert that he knows of his own personal knowledge from whatever the thing is because he's already been qualified as both a slinger and a banger. So as far as that goes, I'm going to overrule that . . . Now, I really don't want to get into any of the other crimes.

\* \* \*

It appears that the circuit court recognized that testimony concerning other crimes would be prejudicial to Jackson. The circuit court did not allow testimony concerning other crimes, yet it did allow Officer Hurd's classification of Jackson as a slinger and a banger, a classification which refers to criminal activity. Further, the circuit court allowed Hurd to testify that Jackson had commit-

ted both types of criminal activity. Thus Hurd is allowed, by virtue of his own definition of the terms, to state that Jackson is a shooter and a drug dealer, in a case where Jackson is charged with shooting Raynor. I simply cannot agree with the majority's holding that this testimony, although admitted in error by the circuit court, is harmless beyond a reasonable doubt.

The majority dismisses Officer Hurd's testimony as merely cumulative because "duplicate testimony was presented to the jury through federal grand-jury transcripts that clearly established that Jackson was indeed a 'banger,' that is, someone involved in gang killings." Most troubling is the majority's rationale for concluding that Officer Hurd's reference to Jackson as a "slinger" was merely cumulative evidence. First, the majority states: "Markevious King also testified before the federal grand jury that Jackson was the leader of the West Side Posse and that King started selling cocaine for the gang at age fourteen." Apparently, the majority concludes that since Jackson and King were in the same gang, and King sold cocaine, then it follows that Jackson also sold cocaine. The relevant testimony of King is as follows:

> Chad Jackson, also known as "Dirty," has been WSP for three years and is the leader.
>
> In the Spring of 1998, King was jumped into the WSP.
>
> Q: How old were you when you first got involved with West Side?
>
> A: Around about twelve, eleven or twelve.
>
> Q: And were you involved in selling cocaine at that age?
>
> A: Not at that age. Around about like fourteen, that's when I — I mean, started selling cocaine.

King does not testify that Jackson sold cocaine. In addition, King does not testify that Jackson directed him to sell cocaine for the gang. The majority deems this testimony as cumulative, apparently assuming that the acts of one gang member may be used to establish that another member of the same gang has committed those same acts.

Next, the majority states: "Takesha Griffin testified before the federal grand jury that Jackson called himself the leader of the West Side Posse, and in answer to a question by a member of the grand jury, agreed that the gang was involved in drugs." The relevant testimony is as follows:

Q: . . . Was Chad a leader in the WSP, though, for everybody that was a part of it?

A: I mean, yeah, because that was because he called himself the leader.

* * *

Q: Do they just do drugs, or are they involved in anything other than the drugs?

A: Drugs.

Griffin answers "yes" to the question of whether the members of the West Side Posse "do drugs." She does not state that Jackson was a drug dealer.

Finally, the majority states that "Chris Bush testified that one of the guns used in the killing came from a West Side Posse 'dope house.'" The relevant testimony is as follows:

Q: Where did you get that gun from, Chris?

A: At the house we had.

Q: What do you mean?

A: We had a little dope house on 15th.

Q: A dope house?

A: Yeah.

Q: And who is "we"? When you say "we," whose house was that?

A: Just me and the little homeys in the hood.

Q: All right, meaning West Side?

A: Yeah.

Q: Did someone actually live there?

A: Yeah.

Q: What was his name?

A: I can't recall that name. He was a dope fiend.

Q: So that was just some place that y'all hung out.

A: Yes, sir.

\* \* \*

Here, it appears that the majority has concluded that since Bush testified that one of the guns used in the killing came from a "dope house" and since members of the West Side Posse "hung out" at the "dope house," as a member of the West Side Posse, Jackson was a drug dealer. The evidence mentioned by the majority is not cumulative to Hurd's description of Jackson as a "slinger."

Further, I do not believe that Officer Hurd's "slinger" reference was relevant. The majority states that "[t]he fact that the two gangs at issue had been in a strong rivalry and had been going 'back and forth' over females . . . certainly seems relevant to Jackson's motive in killing Raynor." The majority fails to explain how Jackson's status as a drug dealer is relevant to Jackson's motive for killing Raynor, if that motive was related to their membership in rival gangs and their argument concerning certain women.

The "slinger" testimony was not relevant. However, it was highly prejudicial. What the State intended to do, through Officer Hurd's testimony, was introduce evidence of Jackson's bad character to prove conformity therewith, in the commission of the crime. This court has allowed the State to do so. I would not.

I would reverse and remand.