IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 9, 2007

**STATE OF TENNESSEE v. JUSTIN MATHIS**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-06495    W. Mark Ward, Judge**

---

**No. W2005-02903-CCA-R3-CD  - Filed July 20, 2007**

---

A Shelby County Criminal Court jury convicted the appellant, Justin Mathis, of first degree premeditated murder, and the trial court sentenced him to life imprisonment.  On appeal, the appellant claims that (1) the trial court erred by allowing an expert to testify about the appellant's potential gang membership; (2) the trial court erred by allowing the State to introduce into evidence a picture of a gun stored in a witnesses' cellular telephone; (3) the trial court erred by allowing into evidence a photograph of the victim's heart; (4) the trial court erred by instructing the jury on criminal responsibility for the conduct of another; and (5) the evidence is insufficient to support the conviction.  Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID G. HAYES and J.C. MCLIN, JJ., joined.

Coleman W. Garrett and William Johnson, Memphis, Tennessee, for the appellant, Justin Mathis.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Reginald Henderson and Valerie Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

This case relates to the appellant's shooting seventeen-year-old Vernon Edwards on the night of Monday, April 5, 2004.  Nineteen-year-old Chan Martin testified that the victim was his best friend.  On April 5, 2004, Martin got out of school about 1:30 p.m. and went to the victim's house.  Martin and the victim worked at a Wendy's restaurant, and Martin had to be at work at 3:00 p.m., but the victim had the day off.  After visiting with the victim, Martin went to work.  About 7:00 p.m., Martin took a thirty-minute break and went to Shontae Handy's house near Wendy's.  The victim

and some other friends were there, and Martin sat outside and talked with them. Martin then drove back to Wendy's in his Pontiac Grand Am and saw the appellant and a group of males sitting in the parking lot. Martin testified that on the night of Saturday, April 3, 2004, he and some friends had gotten into a fight with one of the appellant's friends. The next night, Sunday, April 4, someone broke out the back window in Martin's Grand Am, flattened his tires, and tried to set his car on fire. When Martin saw the appellant and the other males at Wendy's on April 5, he believed they were there to retaliate against him for the fight. Martin left Wendy's, telephoned the victim, and told the victim about the appellant's being at the restaurant. While Martin was driving around, he saw the appellant's green Mazda 626 traveling in the opposite direction. Martin returned to Wendy's, did not see the appellant or the other males, and went inside to work. Seconds later, the victim telephoned the appellant and said, "[T]hey out here." The victim hung up the telephone, and Martin heard gunshots a couple of seconds later. He looked out the window and saw the victim walking in the parking lot and holding his chest. Martin jumped over the restaurant counter, ran outside to the victim, and caught the victim as he fell. The victim was bleeding and holding his chest, and Martin lay down on the ground with him. He stated that he spoke with the police after the shooting, that the police showed him a photographic array on April 7, and that he identified the appellant from the array as the driver of the green Mazda.

On cross-examination, Martin testified that on the night of April 3, 2004, he, Tommy Walker, and the victim fought the appellant's friend, Karin. Martin acknowledged that Karin "got whooped pretty good." No weapons were involved in the fight, and although the appellant was sitting in his car during the fight, he did not participate. On Monday morning, April 5, Martin discovered the damage to his car. Martin stated that he did not know the appellant and had never had a conflict with him. However, Martin had "seen [the appellant] around" and had had previous conflicts with some of the appellant's friends. At first, Martin testified that he did not remember telling the police that Jeremy Love was in the Mazda with the appellant on the night of the shooting. However, he later acknowledged that he identified Love's picture from a photographic array and that he identified Love as being in the green Mazda. He stated that a third boy also was in the Mazda at the time of the shooting. He said that he, the victim, and Walker were not members of a gang. On redirect examination, Martin testified that he did not see the green Mazda after the shooting but that he was focused on the victim and did not look around.

Andiea Walker testified that on the night of April 5, 2004, she was working at Wendy's with Chan Martin. While Martin was taking a break, six males came into the restaurant looking for him, which Walker thought "was kind of weird." She stated that the appellant and Jeremy Love were in the group and that she telephoned Martin to warn him but that he did not answer his telephone. As soon as Walker hung up her telephone, Martin came into the restaurant, and Walker was relieved to see him. She stated that she started to walk outside to her car and that she saw flashes, heard gunshots, and got down on the ground. She ran outside into the parking lot and saw a dark-colored four-door car pull away. She also saw the victim lying on the ground on his stomach. Martin rolled the victim over, and Walker saw that the victim had been shot in the chest. On cross-examination, Walker testified that the six males in the group were all African-American and that they wanted to

know where Martin and the victim were. She stated that at that time, she did not know the appellant's and Jeremy Love's names and that someone told her their names after the shooting.

Shaun Bullock testified that on the evening of April 5, he was at Shontae Handy's house with some of his friends, including the victim and Dante Johnson. The victim and Johnson asked Bullock to drive them to Wendy's, so Bullock drove them and Eric Richmond to the restaurant in Bullock's white Nissan Maxima. When they pulled up to Wendy's, Bullock saw Chan Martin's white Grand Am parked in the parking lot and saw a male leaning into Martin's car through the window. Johnson and the victim got out of Bullock's car and ran toward Martin's car. Bullock heard them shouting, "[W]hat you doing in my partner's car[?]" A green Mazda 626 parked beside Martin's car started to pull away, and Bullock heard eight to ten gunshots. He stated that he could not see who fired the gun but that the gunshots came from the front of the Mazda. He stated that four or five people were in the Mazda.

On cross-examination, Bullock testified that he was not present at the fight on April 3 and did not know Chan Martin. On the night of the shooting, the male leaning inside Martin's car got into the Mazda just before the shooting. The Mazda pulled away from Martin's car, the victim ran toward the Mazda, and someone shot the victim. Bullock stated that the victim and Johnson were unarmed. He said he did not remember testifying at the preliminary hearing that he could not see the victim at the time of the shooting. At first, Bullock thought the gunshots came from the Mazda's passenger side. However, he testified at trial that he could not be sure. He said that he did not know how many people in the Mazda were firing guns and that he did not see the victim get shot.

Eighteen-year-old Dante Johnson testified that he was at Shontae Handy's house on the evening of April 5. Later that night, Shaun Bullock drove Johnson, Eric Richmond, and the victim to Wendy's. During the drive, the victim received a telephone call from Chan Martin. When Bullock pulled into the Wendy's parking lot, Johnson saw a green Mazda 626 parked beside Martin's car and saw a male "messing with Chan's car." Johnson and the victim got out of Bullock's car and asked the male what he was doing. Johnson stated that the victim said something like "what you doing in our partner's car[?]" He said that the male "hopped" into the Mazda and that the Mazda pulled away. Johnson thought he heard the driver of the Mazda say, "Get you one." Johnson and the victim approached the Mazda, and six to nine shots "rang out." Johnson ducked behind a nearby building and saw the victim standing up with his shirt covered in blood. The victim took a couple of steps and dropped to the ground. Johnson ran to him, and the victim was gasping for air. Johnson said the gun used to shoot the victim was black and looked like a small, semi-automatic.

On cross-examination, Johnson testified that as Bullock drove to Wendy's, Johnson was sitting in the rear passenger seat, Eric Richmond was sitting in the front passenger seat, and the victim was sitting behind Bullock. Bullock parked in the Dollar Store parking lot beside Wendy's, and Johnson and the victim walked, not ran, toward the Mazda. He said that he did not see the victim get shot, that he was not a gang member, and that he did not know if the victim was a gang member.

Twenty-two-year-old Shontae Handy testified that on the evening of April 5, she was outside her house with some friends. Handy and her friend Tamara Burrows decided to go to Wendy's to get something to eat, and Handy drove Burrows and two other girls to Wendy's in Handy's green Mitsubishi Montero. While they were turning in the parking lot, a green Mazda drove beside them, and Handy heard some people in the Mazda say, "There they go. There they go." Handy looked to see who the people in the Mazda were talking about and saw the victim. She stated that the Mazda's driver told the victim, "Come get you one," meaning a bullet. As the victim walked toward the Mazda, the driver shot the victim and drove away. Handy stated that she did not see anyone other than the driver with a weapon. On cross-examination, Handy testified that she was a close friend of the victim but that she did not know if the victim was a gang member. After Handy heard someone in the Mazda say, "There they go," Handy heard the victim say, "Here we go." Handy denied telling the police that she was inside Wendy's at the time of the shooting; denied telling anyone that she heard someone in the Mazda say, "Fuck you. Fuck you." just prior to the shooting; and denied telling anyone that the shooting started from the Mazda's front passenger seat.

Scotty George testified that he was at Shontae Handy's house on the evening of April 5. Later that night, Marcus Smith drove George and Tommy Walker to Wendy's in Smith's black Hyundai Scoupe. They went to the restaurant because George had left his keys in Chan Martin's car. George went into the restaurant and heard gunshots. He looked outside and saw a black Mazda 626 with fire coming out of the driver's side window. George was unable to see who was in the car but saw four heads. George did not know the appellant but had seen the appellant in the Mazda the previous night. After the shooting, George went into the parking lot and saw the Mazda pulling out of the lot. He walked over to the victim and helped roll him over onto his back. He stated that he saw only one person shooting the gun, and he later testified that the Mazda was dark green. On cross-examination, George testified that when he, Smith, and Walker arrived at Wendy's, Smith dropped George and Walker off at the restaurant. He said that he, the victim, Shaun Bullock, Smith, and Dante Johnson did not belong to a gang. He said that although he saw shots being fired from the driver's side of the Mazda, he did not see the shooter.

Tommy Walker testified that he was the victim's friend and was with the victim at Shontae Handy's house on April 5. At some point that evening, Chan Martin telephoned the victim and told him that "some guys up here trying to mess with me." After the call, Marcus Smith drove Walker and Scotty George to Wendy's. Another group of males also left Handy's house and drove in a separate car to the restaurant. When Smith pulled into the Wendy's parking lot, Walker saw someone reaching into Martin's car, saw the victim run toward Martin's car, and saw the appellant start shooting. Walker stated that he was sitting in the backseat of Smith's car at the time of the shooting, that George was sitting in front of him, and that George never went into Wendy's. He stated that he was able to see the Mazda 626 by looking out the back window of Smith's car. He stated that he heard more than three gunshots, that four or more people were in the Mazda, that Jeremy Love was sitting in the Mazda's front passenger seat, that the appellant was sitting in Mazda's driver's seat, and that he saw the gun "come out of the car." He stated that he, the victim, and Shaun Bullock did not belong to a gang and that he had never had a confrontation with the appellant.

-4-

Officer Leslie Lynn of the Memphis Police Department testified that he responded to a "shots-fired call" at Wendy's on April 5. When Officer Lynn arrived, the victim was lying on his back and had a gunshot wound to the chest. Officer Lynn secured the scene and put witnesses into the backseats of patrol cars. Witnesses told Officer Lynn what had happened and who was responsible for shooting the victim. The witnesses were upset, angry, and screaming. Chan Martin told Officer Lynn that the appellant shot the victim, and a girl named Tammy told Officer Lynn that she saw the victim confront the appellant and saw shots fired. On cross-examination, Officer Lynn testified that he could not remember Tammy's last name.

Memphis Police Officer Ricky Davison testified that he found spent bullet casings in the Wendy's parking lot, a bullet hole in the windshield of Chan Martin's Grand Am, bullet holes in the east wall of Wendy's and in the restaurant's door, bullet fragments on the carpet in the restaurant, a key ring with two keys in the parking lot, and a bloodstain on the west side of the parking lot. Police officers found a total of eight spent shell casings in the parking lot and in the parking lot exit.

Dr. Thomas Deering testified that in April 2004, he was the interim Chief Medical Examiner for Shelby County and performed the victim's autopsy. The victim had a gunshot wound to the left chest. The bullet traveled through the victim's heart and right lung and struck a rib. The bullet perforated areas of the victim's heart, and the victim had an extensive amount of blood in his chest cavity. The victim tested negative for drugs and alcohol, and the cause of death was a gunshot wound to the chest. Dr. Deering recovered the bullet from the victim.

Servera Brown, the victim's mother, testified that the victim was not a gang member. She acknowledged that the victim had some difficulties in school and that he was expelled for one year for a fight. Brown stated that although school officials believed the fight was gang-related, the victim was not a gang member.

Shelby County Sheriff's Department Officer Louis T. Hall, Jr., testified that on April 6, 2004, he and Sergeant Mark Miller went to the appellant's home to assist with a homicide investigation. At that time, the appellant was a suspect in the victim's death. When the officers arrived, Officer Hall saw a green vehicle in the garage and a black Nissan pickup truck parked on the street. Officer Hall left the residence and went to a location on West Thunderstone Circle to investigate a call that a suspicious vehicle was in the area. When Officer Hall arrived at that location, someone told him that a black Nissan truck with a bumper missing had pulled up to the curb and that someone had dropped something into the storm drain. Officer Hall thought the information was "peculiar," looked into the drain, and found a plastic bag containing a .9 millimeter holster and a Styrofoam bullet holder. Officer Hall collected the evidence and turned it over to Sergeant Miller. On cross-examination, Officer Hall acknowledged that he could not say the holster was purchased specifically to hold a .9 millimeter gun.

Twenty-three-year-old Gregory Mathis, Jr., the appellant's older brother, testified that on April 6, 2004, police officers came to his mother's home at 7616 Iron Cove, where the appellant lived with their mother. The appellant was not home at the time, but Gregory Mathis was present.

The police were looking for the appellant and towed a green Mazda 626 from the property. Gregory Mathis' black Nissan pickup truck was parked outside, but he said nothing was wrong with the truck's bumper. He stated that the previous day, he had talked with the appellant about the incident at Wendy's. He said that he did not remember the appellant's telling him to search the appellant's bedroom. Mathis stated that he did not search the appellant's bedroom but searched his mother's home and found a notebook, a bandana, a Styrofoam bullet container, and a plastic bag for a holster. Mathis acknowledged that he waived his rights and gave a statement to police on April 6. At first, Mathis testified that he did not remember telling the police he found the notebook, bandana, bullet container, and plastic bag in the appellant's bedroom. However, he later admitted finding the items there. Mathis said he put some of the items in a storm drain and that the police found the notebook and the bandana in his truck.

Gregory Mathis testified that he did not remember telling the police that the notebook had gang letters in it. When asked if the appellant was a member of a gang, Mathis said, "Not that I know of." He denied telling the police that he had heard the appellant was a member of the Crips gang, but he acknowledged that the blue bandana had gang writing on it. He said he put some of the recovered items in the storm drain in order to help the appellant. He said that he allowed the police to search his cellular telephone and that his telephone had a picture of a handgun stored in it. He said he owned the handgun.

On cross-examination, Gregory Mathis testified that he tried to hide some of the items in the storm drain because he was scared, confused, and concerned for the appellant. He stated that the picture of the handgun stored in his cellular telephone was a picture of his gun, that it was a Smith and Wesson .45 caliber, and that he had a license to carry the weapon. He stated that he had no personal knowledge of the shooting on April 5, 2004, and that, to his knowledge, the appellant never possessed his gun.

Officer Jimmy Chambers, who worked in the Gang Unit of the Shelby County Sheriff's Department, testified as an expert on gangs. He stated that the color blue usually represented the Crips gang and that gang members often wore bandanas in their pockets. He stated that the blue bandana found in this case looked like a gang "flag," that it had gang writing on it, and that he thought the writing said, "Rollin 20's Gangster Crip." He said the notebook police found also contained several pages of gang information. He said that if a gang member got into a fight, members of the gang often would retaliate against the other fighter. On cross-examination, Officer Chambers testified that he did not know the appellant.

Memphis Police Department Officer Stacy Milligan testified that he took photographs of the Mazda 626 after the police confiscated it. He said that bullet holes appeared to be in the vehicle and that the driver's side mirror had a bullet hole in it. Using a trajectory rod, the police concluded that the bullet came from behind the mirror. On cross-examination, Officer Milligan acknowledged that he was not a ballistics expert and that he did not know when the mirror was damaged. However, on redirect examination, he stated that the mirror's damage looked fairly new.

Special Agent Forensic Scientist Steve Scott with the Tennessee Bureau of Investigation (TBI) Firearms Identification Unit testified as a firearms expert that he tested bullet fragments recovered from the crime scene but could not tell anything about them. He also inspected the bullet recovered from the victim and concluded that it was "consistent with being a .9 millimeter." However, he could not say conclusively that it was a .9 millimeter. He said he microscopically inspected the eight spent shell casings recovered from the crime scene and concluded that they were fired from the same gun.

Sergeant Connie Justice of the Memphis Police Department testified that she was called to Wendy's on April 5, 2004, to investigate a shooting and became the case coordinator. The next day, investigators went to the appellant's home and saw a Mazda 626 in the garage. The appellant was at work, but officers spoke with the appellant's mother and confiscated the car. The car had a bullet hole through the driver's side mirror. The police had received information that the shooting was the result of a fight that had occurred one or two days earlier and was a retaliation for the fight. The appellant became a suspect from witness statements and photographic identifications. The police eventually arrested the appellant and charged him with first degree murder. On cross-examination, Sergeant Justice testified that she believed Tommy Walker identified the appellant as the shooter and that he was the only witness she spoke with who made that identification. On redirect examination, she stated that she was aware other witnesses also had identified the appellant as the shooter.

Memphis Police Officer T. Alexander testified for the appellant that he responded to the shooting at Wendy's on April 5. According to a police report filed in the case, Shontae Handy stated that she heard a black male in a green Mazda say, "Fuck you. Fuck you." Handy told police that the shooting started from the Mazda's front passenger seat. On cross-examination, Officer Alexander acknowledged that he was not an investigator and did not talk with Shontae Handy personally. He also stated that he did not know if Handy's statement in the report was her formal statement.

Twenty-year-old Tamara Burrows testified that on the night of April 5, she drove her girlfriends to Wendy's in order to get something to eat. Burrows' car was near the parking lot exit between the restaurant and the Goodyear building next door. Burrows heard some vulgar language and heard gunshots. She said the shots came from the passenger seat of a green Mazda 626. Burrows saw the gun outside of the car and on top of the car's roof. She stated that she heard more than one shot and that the Mazda sped out of the parking lot. The next morning, Burrows gave a statement to the police. The police showed her a photographic array, but she could not identify anyone in the Mazda.

On cross-examination, Burrows acknowledged that she did not say anything in her statement about someone shooting over the Mazda's roof. She said she did not remember the color of the gun but acknowledged saying in her statement that the gun was black. She testified that the gun looked like a .9 millimeter. She acknowledged that in her statement to police, she said the shots "appeared" to come from the passenger seat. However, she testified that she was not absolutely sure where the shots came from in the Mazda. The jury convicted the appellant of first degree premeditated murder.

## II. Analysis

### A. Expert Testimony

The appellant claims that the trial court erred by allowing the State to present evidence that the appellant was a gang member. He also argues that the trial court erred by allowing Officer Jimmy Chambers to testify as an expert about gang activity because Officer Chambers was not qualified to give such testimony and because the appellant's involvement with a gang, if any, was irrelevant as to why the victim was killed. He contends that any evidence about his being a gang member was highly prejudicial and denied him the right to a fair trial. The State contends that the trial court properly allowed it to present evidence to the jury regarding the appellant's gang membership and properly allowed expert testimony related to the appellant's gang activity. We conclude that the appellant is not entitled to relief.

Initially, we note that although the appellant argues in the issues section of his appellate brief that evidence he was a gang member was irrelevant, he argues in the conclusion section of his brief that the evidence was inadmissible bad character evidence. However, the appellant failed to make any argument, cite to any authority, or cite to the record in support of his contention that the evidence was bad character evidence prohibited by Tennessee Rule of Evidence 404(b). See Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). Moreover, the appellant never objected to the State's questioning its witnesses about the appellant's potential gang membership, never objected to testimony about the gang-related blue bandana or notebook, and never objected to the State's introduction of those items into evidence. Therefore, he has waived any issue regarding this gang-related evidence. See Tenn. R. App. P. 36(a).

The appellant, however, did object to Officer Chambers' testimony. Officer Chambers testified that he began working with gangs in 1991 and had been working in the Gang Unit since 1997. He stated that he received training on gangs in Chicago, attended the TBI's gang class, and attended several gang seminars in Memphis. He stated that he was involved with the identification of gangs and their activities, that ninety percent of his job currently involved identifying gangs in schools, and that he had conducted over four hundred gang seminars for the Shelby County and Memphis Schools. The State moved to have the trial court declare Officer Chambers an expert on gangs and "all the things that are involved with gangs and gang criminal activity." During voir dire by the defense, Officer Chambers testified that he began learning about gangs in 1991 as a corrections officer. Officer Chambers attended the third annual International Gang Seminar in Chicago for one week in 2000 and was trained with the Tennessee Investigators Association with Gangs in 2002 and 2003. He said that he also had informal "street training" and had been qualified as a gang expert in one or two prior criminal trials.

The State argued that Officer Chambers' testimony was relevant to show the appellant's intent and "why things are done." The defense argued that Officer Chambers' testimony was irrelevant because the issue in this case was the killer's identity, "not whether this young man is a gang member or not." The trial court concluded that Officer Chambers had specialized knowledge

on gangs, that his qualifications were sufficient to declare him an expert in the area of gang activities, and that his testimony would substantially assist the jury. On appeal, the appellant argues that such testimony "is not a recognized specialty area of expertise," that Officer Chambers was not qualified to testify as a gang expert, and that "his rambling generalized testimony could not substantially assist the jury in understanding the evidence."

Tennessee Rule of Evidence 702 provides, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." An expert may base his opinion upon facts or data imparted to or perceived by the expert prior to or at a hearing, and the facts or data need not be admissible if they are the type of facts or data reasonably relied upon by experts in the particular field. Tenn. R. Evid. 703. The trial court shall disallow testimony in the form of an opinion if the underlying facts or data indicate a lack of trustworthiness. Id. Moreover, expert testimony must be both relevant and reliable before it may be admitted. McDaniel v. CSX Transp., 955 S.W.2d 257, 265 (Tenn. 1997). "Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court." State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). This court will not overturn the trial court's ruling regarding the admissibility of expert testimony absent an abuse of discretion. Id.

Initially, we find no merit to the appellant's claim that gang activity is not a recognized area of expertise. See, e.g., United States v. Hankey, 203 F.3d 1160, 1169 (police officer was qualified to testify as "gang expert"); Jackson v. State, 197 S.W.3d 468, 471 (Ark. 2004) (same); People v. Williams, 753 N.E.2d 1089, 1094 (Ill. App. Ct. 2001) (same); State v. Montea Wilson, No. W2000-00748-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 406, at *14 (Jackson, May 3, 2002) (expert qualified to testify as an expert on gang affiliation). We also disagree with the appellant's argument that Officer Chambers was not qualified to testify as an expert on gangs. Our supreme court has observed that an expert witness "may acquire the necessary expertise through formal education or life experiences." State v. Reid, 91 S.W.3d 247, 302 (Tenn. 2002). "However, the witness must have such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise is beyond the scope of common knowledge and experience of the average person." Id. At the time of the appellant's 2005 trial, Officer Chambers had been working with gangs since 1991 and had been a member of the Gang Unit since 1997. Officer Chambers received formal training on gangs by taking seminars and classes and received informal training "from being out on the street" and working with the TBI on investigations. We conclude that the trial court did not abuse its discretion by concluding Officer Chambers was qualified to testify as a gang expert.

We also disagree with the appellant's claim that Officer Chambers' testimony was irrelevant. After the defense objected to Officer Chambers' testimony, the State informed the trial court that the expert's testimony was relevant to show the appellant's motive or intent to shoot the victim. During the State's closing statement, the prosecutor argued to the jury that the appellant shot the victim as gang-retaliation for the victim's beating Karin on April 3. Based upon the State's theory of the case,

we must agree that evidence the shooting was gang-related was relevant to show the appellant premeditated killing the victim, an element of first degree murder. See Tenn. Code Ann. 39-13-202(a)(1) (defining first degree premeditated murder); State v. Demond Gardner, No. W2002-00607-CCA-R3-CD, 2003 Tenn. Crim. App. LEXIS 570, at *26 (Jackson, June 26, 2003) (evidence that shooting was gang-related was relevant to show premeditation). We note that the appellant argues that the only issue in this case was the shooter's identity. However, while we agree that the shooter's identity was the main issue in the case, the State was still obligated to prove that the shooter premeditated the killing. Ironically, as we will discuss later in this opinion, the appellant claims as a separate issue on appeal that the evidence is insufficient to show he acted with premeditation. Thus, evidence about the appellant's being a gang member was relevant. Moreover, we cannot say that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 403. We conclude that the appellant is not entitled to relief.

### B. Cellular Telephone Image

The appellant claims that the trial court erred by allowing the State to introduce into evidence a photograph of Gregory Mathis' cellular telephone, showing an image of a handgun that was stored in the phone. He contends that the photograph was irrelevant and, coupled with Officer Chambers' testimony, highly prejudicial. The State contends that the photograph was relevant because the gun may have been the murder weapon and that, in any event, any error was harmless. We conclude that the photograph was irrelevant but that the error was harmless.

During Gregory Mathis' direct testimony, he stated that he allowed the police to search his cellular telephone and that he had an image of his handgun stored in the phone. The State then handed Mathis a photograph of a cellular telephone, showing a picture of a handgun on the phone's flip-screen. The State asked Mathis to identify the photograph, and the defense objected, arguing that the photograph was irrelevant. The State argued to the trial court that the photograph was relevant because the gun visible in the photograph could have been the murder weapon. The trial court concluded that the photograph "does have some relevance even though it might be remote relevance," that it did not have any prejudicial effect, and that it was admissible. Mathis identified the photograph. On cross-examination, he testified that the gun in question was his gun, that it was a .45 caliber handgun, and that he had a permit to carry the gun. He stated that the police questioned him about the gun but never attempted to confiscate it.

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. In this case, the State offered no evidence to show that the gun in question was related to the victim's murder. The police were aware of the image stored in Gregory Mathis' cellular telephone, questioned Mathis about the gun, and made no attempts to confiscate it. Therefore, we conclude that the photograph was irrelevant. However, Mathis testified on cross-examination that the gun was his, that he was licensed to carry it, and that, to his knowledge, the appellant had never possessed the weapon. No evidence linked the gun to the

-10-

victim's murder, and we conclude that the trial court's error did not affect the jury's verdict. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

## C. Heart Photograph

Next, the appellant contends that the trial court erred by admitting into evidence a photograph of the victim's heart. He contends that the photograph "was not necessary to assist the trier of fact in resolving any issue in dispute" and that the photograph was inflammatory and prejudicial. The State argues that the trial court did not err by admitting the photograph into evidence because it aided Dr. Deering with his explanation of the victim's death and that, in any event, any error was harmless because the photograph was not gruesome. We conclude the trial court erred by admitting the photograph into evidence but that the error was harmless.

Prior to Dr. Deering's testimony, the State announced that it planned to introduce autopsy photographs into evidence. The defense objected to one of the photographs, a color photograph of the victim's heart which had been removed from the victim's body during the autopsy. The defense argued that the photograph was prejudicial and unnecessary because the defense was not disputing the fact that the victim had been shot in the heart. The State claimed the photograph was relevant to show the victim's injury and because "it gives a visual picture of what he's going to explain to the jury." The State also argued that the photograph "identifies the person as the one that [Dr. Deering] did the autopsy on and . . . what the bullet did." The State told the trial court that the photograph was "not a nasty picture in any way." The trial court ruled that all of the photographs were admissible. Regarding the photograph of the heart, the trial court specifically stated that it was "a little more closer a question" but concluded that "if it's close, the evidence comes in . . . . The Supreme Court teaches us that it's weighted toward the admission of the evidence, not the exclusion of the evidence."

In State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978), our supreme court explained as follows:

> The more gruesome the photographs, the more difficult it is to establish that their probative value and relevance outweigh their prejudicial effect. In the presence of an offer to stipulate the facts shown in the photograph, the State's burden of justification is often difficult to sustain. Failure of the defense to dispute the testimony that the photographs illustrate may have the same effect.
>
> In some cases, photographic evidence has been excluded because it does not add anything to the testimonial descriptions of the injuries. Those made during or after an autopsy are most often condemned, because they present an even more horrifying sight and show the body in an altered condition and because lay jurors normally

-11-

do not have the experience necessary to draw correct inferences from the appearance of internal organs.

(Citations omitted.)

Turning to the instant case, we fail to see any probative value in the photograph. The State argued that the photograph was necessary to show the victim's injury, his identity, and to illustrate the doctor's testimony. However, the State introduced into evidence other photographs showing the gunshot wound to the victim's chest. The defense did not dispute the victim's cause of death or the fact that the victim was shot in the heart, and Dr. Deering's testimony adequately explained the victim's heart injury to the jury. Notably, Dr. Deering was asked only to identify the photograph of the heart and confirm that the injuries matched the diagram of the heart in his autopsy report. The photograph added nothing to his testimony. Therefore, we conclude that the trial court erred by admitting the photograph into evidence. In any event, we also conclude that the trial court's error was harmless. In the photograph, the heart is clean and very little blood is visible. The photograph is not particularly gruesome, and we cannot conclude that the evidence more probably than not affected the result of the trial. See Tenn. R. App. P. 36(a); Tenn. R. Crim. P. 52(a).

## D. Criminal Responsibility Instruction

Next, the appellant claims that the trial court erred by instructing the jury on criminal responsibility for the conduct of another because no other individuals were charged or even accused of the crime. The State argues that the trial court properly instructed the jury. We agree with the State.

"A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Tennessee Code Annotated section 39-11-402(2) provides that an appellant is criminally responsible for the actions of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, [the appellant] solicits, directs, aids, or attempts to aid another person to commit the offense." The appellant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)). The defendant's requisite criminal intent may be inferred from his "presence, companionship, and conduct before and after the offense." State v. McBee, 644 S.W.2d 425, 428 (Tenn. Crim. App. 1982). "[C]riminal responsibility is not a separate, distinct crime." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). Moreover, an "indictment that charges an accused on the principal offense 'carries with it all the nuances of the offense,' including criminal responsibility." Id. at 173 (quoting State v. Lequire, 634 S.W.2d 608, 615 (Tenn. Crim. App. 1981)). A defendant convicted under a criminal responsibility theory "is guilty in the same degree as the principal who committed the crime" and "is considered to be a principal offender." Id. at 171.

"It is the duty of a trial judge to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986). In other words, "a defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Generally, the trial court must instruct the jury on the rules of law applicable to the issues that are fairly raised by the evidence adduced at trial. State v. Townes, 56 S.W.3d 30, 36 (Tenn. Crim. App. 2000), overruled on other grounds by State v. Terry, 118 S.W.3d 355 (Tenn. 2003). In determining whether jury instructions are erroneous, this court must review the charge in its entirety and invalidate the charge only if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998).

In this case, the trial court overruled the appellant's objection to the instruction on criminal responsibility, concluding that the instruction was "appropriate in this case." We agree and conclude that the criminal responsibility instruction was fairly raised by the evidence. The evidence reveals that the appellant drove several other males to Wendy's. The group was armed, was looking for Chan Martin and the victim, and planned to retaliate against them for the fight on April 3. Through his cross-examination of the State's witnesses, direct examination of his own witnesses, and closing statement, the appellant suggested to the jury that a passenger in the Mazda shot the victim. From the testimony, the jury reasonably could have concluded that the appellant not only aided one of the passengers with shooting the victim but that the appellant and all of the males in the Mazda went to Wendy's with the requisite intent to harm the victim. The trial court did not err by providing the criminal responsibility instruction.

E. Sufficiency of the Evidence

Finally, the appellant claims that the evidence is insufficient to support the conviction because of inconsistencies in the witnesses' testimony and because the State failed to establish premeditation. The State contends that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In order to obtain the appellant's conviction for first degree premeditated murder, the State was required to prove, beyond a reasonable doubt, that the appellant committed the "premeditated and intentional killing of [the victim]." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. at (d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See id. at 914-15; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

Taken in the light most favorable to the State, the evidence shows that on April 3, 2005, the victim and Chan Martin got into a fight with the appellant's friend, Karin, and beat Karin. On the night of April 5, the appellant and five other males went to Wendy's looking for Martin and the victim to retaliate for the fight. When Martin returned from his break, he saw the males in the parking lot and believed they were there to harm him. He telephoned the victim, and two carloads of young men drove to Wendy's in response to Martin's call. When Shaun Bullock's car pulled into the Dollar Store parking lot next to Wendy's, the victim and Dante Johnson saw the appellant's green Mazda parked beside Martin's white Grand Am and saw a male leaning into Martin's car. They got out of Bullock's car and ran toward the Mazda. Shontae Handy was sitting in a car next to the appellant's car and heard someone in the Mazda say, "There they go." She realized that the person in the Mazda was talking about the victim. Handy and Johnson testified that they heard someone in the Mazda tell the victim, "Come get you one." The victim ran toward the Mazda, and Tommy Walker saw the appellant start shooting at the victim. One of the shots struck the victim's heart, killing him. Given that the armed appellant went to Wendy's looking to retaliate against the victim, that the appellant told the victim to "come get you one" just before the shooting, and that the victim was unarmed, we conclude that the evidence is sufficient to show that the appellant premeditated killing the victim. As for inconsistencies in the witnesses' testimony, the defense thoroughly cross-examined the witnesses about those inconsistencies, and the jury, as was its prerogative, resolved any inconsistencies in favor of the State. The evidence is sufficient to support the conviction.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE