IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 7, 2026 Session

## STATE OF TENNESSEE v. GERALD ELIJAH CROSSLEY

**Appeal from the Circuit Court for Madison County**
No. 20-69    Kyle C. Atkins, Judge

———————————————————

**No. W2024-00280-CCA-R3-CD**

———————————————————

Defendant, Gerald Elijah Crossley, challenges his Madison County Circuit Court jury convictions of first degree murder, attempted first degree murder, aggravated assault, and employing a firearm during the commission of a dangerous felony, arguing that the trial court erred by admitting evidence of Defendant's alleged gang affiliation and expert testimony about gang-related activities and that the evidence was insufficient to establish his identity as the perpetrator. Because we conclude that the trial court did not err in admitting the challenged evidence and that the evidence was sufficient to support Defendant's convictions, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and J. ROSS DYER, JJ., joined.

Raven Prean Morris, Assistant Public Defender - Appellate Division (on appeal); and David W. Camp, Jackson, Tennessee (at trial), for the appellant, Gerald Elijah Crossley.

Jonathan Skrmetti, Attorney General and Reporter; Ryan W. Davis, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Bradley F. Champine, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from the July 27, 2019 shootings of Cole Felton and Deandre Wright as they sat in a car parked in the driveway of a residence on Cinnamon Drive in Jackson, which led to Mr. Wright's suffering serious injuries and Mr. Felton's death.

1

**Factual and Procedural Background**

Because Defendant was just shy of his seventeenth birthday at the time of the offenses, this case originated in juvenile court, but following a hearing on October 2, 2019, the case was transferred to the Madison County Circuit Court for Defendant to be tried as an adult. On February 3, 2020, the Madison County Grand Jury charged Defendant via a four-count indictment with the first degree premeditated murder of Mr. Felton, the attempted first degree murder of Mr. Wright, the aggravated assault of Mr. Wright, and employing a firearm during the commission of the attempted first degree murder of Mr. Wright.

Defendant's first trial ended in a mistrial on April 13, 2021, when the jury was unable to reach a verdict.

On May 12, 2021, the State moved the trial court to determine the admissibility of evidence of Defendant's gang affiliation, arguing that it intended to show that gang retaliation was the motive for the shootings in this case. The State noted that jurors from the first trial cited the failure to show a motive for the shooting as one of the reasons they were unable to reach a unanimous verdict. The State asked to admit evidence of Defendant's June 2019 arrest for weapons and drug possession alongside Jamaine Tipler, a known member of the Ghost Mob set of the Vice Lords; a social media video recording showing Defendant dressed in gang-related attire, flashing gang signs, and declaring allegiance to the Ghost Mob set; and the testimony of Jackson Police Department ("JPD") Investigator Ashley Robertson on the history, membership, rules, and enforcement practices of the Ghost Mob Vice Lords. The State argued that the contents of the recording suggested that Defendant intended to retaliate against members of the Hoover Crips, the rival gang that claimed responsibility for the recent death of Ghost Mob Chief Ronald "Big Pokey" Terry, given that the location of the shooting was the residence of Lavon Lake, a known member of the Hoover Crips. The State also argued that the proffered evidence offered important context for the offenses and provided evidence of Defendant's identity as the perpetrator.

Defendant observed that the attempt to admit evidence of Defendant's alleged gang affiliation was "directly contrary" to the position the State took before the first trial when it "agreed that no gang evidence should be submitted to the jury as to the issue of guilt." Defendant argued that "unsubstantiated evidence" of Defendant's alleged gang affiliation should be excluded because it would confuse the jury.

I. Motion Hearing

At the July 19, 2021 hearing on the motion, Madison County Sheriff's Office ("MCSO") Deputy Cory Chance testified that on June 19, 2019, he executed a traffic stop on a vehicle that matched the description of a vehicle used in an armed robbery on McGee Loop. Defendant, Jamaine Tipler, and Jacobi Snipes were in the vehicle together.

Defendant was charged with possession of a firearm and possession with intent to sell marijuana.

Madison County Juvenile Detention Center monitor Steven Reed, Sr., testified that Defendant told him that he was affiliated with a gang when he came into the facility on December 18, 2017, but did not identify the gang. Mr. Reed later concluded that Defendant was affiliated with the Vice Lords after he saw the following carved on the inside of the door of the "all purpose room" on December 20, 2017: "Free me. G. Crossley. Almighty Vice Lord." Defendant was not detained at the facility on the day that Mr. Reed observed the carving, and Mr. Reed did not know how long the carving had been there.

Investigator Robertson testified that he joined the gang enforcement team in 2014 and that he had 150 hours of specialized training on gang investigation during which he learned about the history, rank structure, rules, hand sign symbols, clothing, and punishments inflicted for rule violations. The investigator had conducted numerous interviews with known members of both the Ghost Mob Vice Lords and the Hoover Crips arrested in Jackson and had participated in proffer meetings with gang members, all of which led to his developing relationships with gang members who agreed to act as confidential informants and who provided information regarding gang functioning and membership. Through this training and firsthand experience, Investigator Robertson learned that there was a history of violence between the Ghost Mob Vice Lords and the Hoover Crips in Jackson. Investigator Robertson had offered expert testimony about both gangs in criminal court. In two cases in particular, Investigator Robertson had been permitted to testify that the history of retaliatory violence provided motives for specific crimes. He acknowledged that he had not been called to testify to gang-related evidence when the victim was not a gang member.

Investigator Robertson testified that he concluded that Defendant was a member of the Unknown Vice Lords, who are also known as the Ghost Mob Vice Lords, after Defendant was arrested in the company of Tipler, "the head" of the Ghost Mob Vice Lords in Jackson. The investigator said that after Tipler, whose alias is "Big Ghost," was released from federal imprisonment in 2018, he began heavily recruiting juveniles to join the Ghost Mob and that "he had them out committing violent crimes." He recalled that he testified about Tipler's rank and involvement with the Ghost Mob at the trial of eighteen-year-old Snipes, a case wherein Tipler "essentially ordered Jacobi Snipes to carry out a hit on" a member of the Ghost Mob who had switched his allegiance to the Traveling Vice Lords.[1] Tipler had also been charged alongside Rodarius Woods and Cordell Long, members of the Ghost Mob in their late teens or early twenties, in relation to a shooting that occurred on Martin Street in Jackson.

---

[1] *See State v. Snipes*, No. W2020-00916-CCA-R3-CD, 2021 WL 4523074 (Tenn. Crim. App. Oct. 4, 2021).

3

The State played a video recording discovered on Defendant's cell phone following his arrest that featured Defendant and an individual named Devondre Anderson, a known member of the Ghost Mob whose street name is "Bubba Gump." In the recording, Defendant is wearing a T-shirt depicting Terry, Chief Vice Lord for West Tennessee. Terry was murdered in Memphis in January 2019, just before Tipler directed Snipes to shoot Darren Harris. Investigator Robertson said that he testified in Snipes' trial that Terry's death was the motive for the shooting of Harris.[2] Defendant also referred to himself as "Ghostie, talking about his membership as a Ghost Mob Vice Lord." Anderson mentioned loyalty to "Willie Mob," which the investigator explained was a reference to "Willie Lloyd who was considered the father of the Unknown Vice Lords." Anderson also said they intend to "slide" on someone, which Investigator Robertson explained "means they're going to shoot them, do a drive-by, basically shoot them."

Investigator Robertson testified that the practice of having younger members of the Ghost Mob participate in shootings fit within a larger pattern of retaliatory violence orchestrated by Tipler involving the Hoover Crips. He said that Messrs. Felton and Wright were shot as they sat in front of the address of known Hoover Crip Lavon Lake. Neither of the victims lived at that residence.

Investigator Robertson said that although no evidence suggested that Mr. Lake was the specific target of the shooting, any Hoover Crip would have been a satisfactory target. He said, "The only thing I can tell you is that [Defendant] is a Vice Lord, Lavon Lake is a Hoover. They were shooting back and forth at that time and will continue shooting back and forth as long as we're all here."

JPD Sergeant Robert Groves, who was the lead investigator in this case, testified that during the search of Defendant's residence, he photographed the screen of an iPhone that was vibrating and receiving alerts for "missed calls, text messages, other app alerts" before it was collected and tagged into evidence. The phone showed a missed FaceTime call shortly after the shooting from a number that the JPD associated with Tipler. Additionally, that number was saved as a contact on the Signal app on the phone as "Big G" with a ghost emoji, a reference to Tipler's street name, Big Ghost. Sergeant Groves confirmed that neither of the victims lived at the residence where the shooting took place and that neither owned the vehicle in which they were shot.

During cross-examination, Sergeant Groves acknowledged that the State had always had the information about Defendant's gang membership and the gang connection to the shooting in this case and that he did not present any of that information during Defendant's first trial. Sergeant Groves said that he did not investigate Anderson because he did not know his identity until after the first trial.

---

[2] *See Snipes*, 2021 WL 4523074, at *7.

4

JPD Sergeant Nick Donald, who assisted in the investigation, testified that while he was interviewing Defendant, Defendant's grandmother, who was present in the interview because Defendant was a juvenile, told the sergeant that Tipler had paid for an attorney to represent Defendant in a previous case. Despite this, Defendant repeatedly denied that he knew Tipler until he was confronted with the fact that the two had been arrested together only weeks before the shooting in this case.

At the conclusion of the proof, the State asked the trial court to allow Investigator Robertson's testimony to explain the contents of the video recording Defendant made within hours of the shooting, arguing that Defendant's claim of allegiance to the Ghost Mob, his wearing of a shirt featuring Terry, his display of a weapon, the references both Terry and Lloyd, the mention of an intention to "slide," all suggested retribution against rival gang members as a motive for the shootings. The State also argued that the shootings in this case fit within a larger pattern of retaliatory gang violence that could be explained by the evidence of Defendant's gang affiliation, asserting that the larger gang war provided context for the shootings in this case.

Defendant argued that the evidence was irrelevant and asserted that the State should not be permitted to "change horses midstream" when they agreed before the first trial "that no gang evidence should be submitted to the jury as to the issue of guilt." Defendant asserted that the State "was manufacturing motive where motive doesn't exist" and that the State wanted to present the gang evidence to "try to get a conviction where they couldn't get one before."

The trial court ruled that Mr. Robertson was qualified to offer an expert opinion in gang organization and violence. The court further found that Investigator Robertson's testimony was relevant to the issues of motive and premeditation and stated that it would provide an instruction that was "very, very specific as to the limited purpose for which the jury can consider the information," including completing the "story as to the State's theory of the case," showing "a motive under the State's theory of the case," and establishing Defendant's identity as who "they believe to be the perpetrator and how it fits into the larger pattern and scheme of things." The court concluded that the video recording was admissible but determined that Mr. Reed's testimony about the carving on the door was too speculative to be admissible. Regarding Deputy Chance's testimony about Defendant's being arrested with Tipler, the trial court concluded that the probative value of that evidence was not substantially outweighed by any potential for unfair prejudice but again stated that it would offer a limiting instruction.

## II. Trial

On July 27, 2019, Messrs. Wright and Felton met at a residence on Cinnamon Drive in Jackson and got into a white Tahoe that Mr. Felton had borrowed while his own vehicle was being detailed in preparation for his birthday celebration in Memphis. Mr. Felton got

into the Tahoe on the driver's side, and Mr. Wright got in on the passenger's side. Before Mr. Felton could even start the vehicle, a slim person wearing a black hoodie despite the heat came "full stride running up" from behind the Tahoe and fired into the driver's side of the vehicle, striking Mr. Felton in the face. As the perpetrator continued to fire, Mr. Wright opened the passenger's side door and rolled onto the ground and was struck once in the elbow. The injury caused him to be permanently partially disabled. When he looked around, he "didn't see anybody. It was like the little dude just disappeared." Mr. Wright said that neither he nor Mr. Felton were armed and that they were "ambushed" by the perpetrator, who was approximately 5′8″ tall with a "smooth" face "like this person didn't shave." Mr. Wright said that he thought that the perpetrator ran away on the driver's side of the vehicle since he did not pass by Mr. Wright as he lay on the ground. He acknowledged that he could not identify Defendant as the perpetrator.

Mr. Felton died from multiple gunshot wounds: one to the left shoulder, one to the left back, one to the left buttock, and one to the face. All the shots were fired from an intermediate range, and the medical examiner agreed that the location of Mr. Felton's wounds was consistent with Mr. Wright's description of how the shooting took place.

JPD Officer Ronald Dewald brought canine officer Echo to the scene, who led Officer Dewald directly from the Tahoe and spent shell casings at the scene of the shooting less than 100 yards to the backyard of 57R Cinnamon Drive, before jumping "off in the kudzu just a little bit." Echo stuck "his nose down in that kudzu and lay[] down," and Officer Dewald pushed the kudzu back and saw "a pistol laying" on the ground. After another officer collected the firearm, Officer Dewald again commanded Echo to track, and Echo went immediately "to the rear door of 57" and began "jumping and scratching at the door." After the occupants, including Defendant, exited the residence, Officer Dewald commanded Echo to search the residence, but Echo did not locate anyone else inside the residence. Officer Dewald returned to the backyard to see if Echo would pick up any track other than the one that led him to the pistol, but he did not.

Officers collected the 9 mm Luger firearm, which "was loaded with a jacketed hollow point in the chamber" as well as nine rounds of unspent ammunition in the magazine, two of which rounds were jacketed hollow points. Officers also collected four 9 mm Luger shell casings from the scene, and forensic examination by the Tennessee Bureau of Investigation ("TBI") established that all four casings were fired from the firearm recovered in the grass behind Defendant's residence. Presumptive gunshot residue testing of Defendant's hands and shorts following his arrest was positive, and later TBI microanalysis revealed the presence of gunshot residue on a black hoodie discovered wedged between a couch and the wall near the back door of Defendant's residence.

Officers collected Defendant's cell phone from his residence, and the TBI performed a forensic extraction of the contents of the phone that showed that on July 25, 2019, Defendant searched "house arrest ankle bracelet." The extraction also included

6

photographs and video recordings that depicted Defendant holding the murder weapon on the day of the offenses. The photographs and recordings were displayed to the jury. The timestamp on the video files in Instagram indicated that they were created at approximately 2:25 p.m. on the day of the offenses.

Investigator Robertson testified as an expert in gang activities that the rivalry between the Ghost Mob and the Hoover Crips heated up in November 2013, when two members of the Ghost Mob survived a shooting at the hands of a Hoover Crip named Antonious Merriweather. The Ghost Mob retaliated by murdering Mr. Merriweather's brother, Alexander. Five months later, Hoover Crip Gary Morris was shot and killed by members of the Ghost Mob, and in retaliation, Hoover Crip Michael Thomas murdered Ghost Mob member Rodney Pearson. Sporadic violence between the rival gangs continued for several years until August 2018 when Hoover Crip Braxton Watkins was shot and killed by Ghost Mob member Randavious Sinclair. Five days later, Sinclair survived an attempt on his life by members of the Hoover Crips at the home of Ghost Mob member Snipes. Sinclair survived a second attempt on his life at the hands of the Hoover Crips two months later. Around this same time, thirty-five-year-old Tipler, the leader of the Ghost Mob in Jackson, was released from federal prison following service of a thirteen-year prison term. Tipler immediately began recruiting juveniles to join the Ghost Mob, even going so far as to "offer them money to convert to his gang." The result was "a major rise in the number of gang membership in the Ghost Mob Vice Lords, and it was predominantly teenagers to young teens." Defendant was arrested in the company of Tipler and Snipes on June 19, 2019.

The Hoover Crips carried out another drive-by shooting at Snipes' house on July 23, 2019, nearly killing Denisha Simmons. Within an hour of that shooting, Snipes, along with fellow Ghost Mob Vice Lords Charles Key and John Ferrell, carried out a drive-by shooting at the home of Hoover Crip Jeffery Conner.

Investigator Robertson viewed the video recording from Defendant's cell phone that showed him brandishing a firearm and saying that he was "with them Ghosties." He testified that the other person in the video recording found on Defendant's phone was Anderson, a known member of the Ghost Mob. Investigator Robertson explained that Defendant's saying, "I'm with them Ghosties," was a statement that Defendant "has membership in the Ghost Mob Vice Lords." Additionally, Defendant wore a shirt with the image of Terry, the Chief Vice Lord of West Tennessee who was murdered in Memphis on January 10, 2019. The investigator explained that "Pokey Mob" also referred to Terry. The investigator also explained that "HK" meant "Hoover Killer" and that "slide" meant "[t]hat they're going to do a drive-by or . . . they're going to shoot." "Willie Mob" was a reference to Willie Lloyd, "one of the original founders" of the Vice Lords.

Investigator Robertson stated that a photograph of the lock screen on Defendant's cell phone taken on the night of the shooting showed that he had missed a Signal

notification from a contact depicted as "Big G with two ghost emojis out beside it." Investigator Robertson reiterated that Tipler's street name was Big Ghost. Investigator Robertson agreed that Defendant's "arrests, the pattern of retaliatory gang shootings" ordered by Tipler, and the fact that Mr. Felton bore some resemblance to Mr. Lake, a known Hoover Crip who lived at the residence on Cinnamon Drive where the shooting occurred, fit within the pattern of retaliatory shootings between the Ghost Mob and the Hoover Crips. Although he had no direct evidence that Tipler ordered Defendant to shoot Mr. Lake, the evidence suggested gang retaliation as the motive for the shooting.

Federal Bureau of Alcohol, Tobacco, and Firearms Special Agent Groves, the former JPD officer who participated in the investigation in his former employment, compared the handgun recovered from Defendant's backyard with the handgun depicted in the video recording and images from Defendant's phone, including examining the serial numbers, and determined that the handgun in the video and images was the same as that recovered from Defendant's backyard.

Juvenile Detention Center Monitor Earl Bowers fitted Defendant with an ankle monitor in good working condition on June 20, 2019, but when he examined the monitor following Defendant's arrest in this case, he noticed that "it had been tampered with" and "burnt." During the search of Defendant's residence, officers collected snips of the type used to cut wire during jewelry making, a knife, "three different screw drivers," and a crochet hook. TBI forensic toolmark analysis established that the gouge marks on Defendant's ankle monitor "were made by a flat-bladed tool with a blade width of approximately 3/16th of an inch" that had the same class characteristics and subclass characteristics as the screwdriver with "the 3/16th's blade" recovered from Defendant's residence "or a screwdriver that was forged on the same machine." A recording of a phone call placed by Defendant while he was incarcerated was admitted into evidence and played for the jury. During the call, Defendant asked a female on the phone to "get that tool for me, the tool that you had. Get the tool." Defendant added, "You know, at grandma's house, that tool that you had for your ankle."

Tracking Solutions owner Kristen Zachary, who testified as an expert in electronic monitoring equipment and about the monitoring records generated by Defendant's ankle monitor, explained that the GPS device worn by Defendant in 2019 was "one of the most sophisticated" on the market and that it offered live tracking using both satellites and cellular towers to offer accurate real-time location information. Because of the age of the case, she was unable to retroactively determine the exact distance that was set for Defendant's home zone but that, generally, a standard zone would allow a device wearer "to move a hundred and twenty-five feet in any one direction from the center of his home before it would alert us." No zone alerts were sent from Defendant's device between 6:00 and 7:00 p.m. on July 27, 2019.

Ms. Zachary said that the devices were difficult but not impossible to remove. She said that the monitor was outfitted with a steel band wrapped in plastic to prevent the band from being cut. Additionally, the device "connects through special screws" that could only be manipulated using "a special bit." She said that using a "similar-sized bit" would strip the screw and cause it to remain stuck and that jiggling the screws would trigger a tamper alarm. Finally, she said that the device was equipped with "a 360 light circuit," that, if tripped, would send a tamper notification.

Thirty-one separate tamper notifications were sent from Defendant's ankle monitor on July 26 and 27, 2019, but an internal investigation revealed that the person assigned to take the calls "had improperly ignored the calls from the monitoring center about . . . tamper alarms to the [Defendant's] device" and "had deliberately suspended the alarms to the device until the end of her shift because she did not wish to be bothered with it." Tracking Solutions records confirmed that on the day of the shooting, an officer at the detention center told the company "to disregard strap tampers while he is at home" because "this bracelet is too big." The records indicated that similar exchanges occurred multiple times until approximately 4:05 p.m., when the same officer told the monitoring company "that the alarm is suspended until 11 o'clock." Ms. Zachary said that instead of suspending the alarms, someone should have made "visual contact with the person wearing the ankle monitor" because there was "a definite issue, and it needs to be inspected for tampering."

Ms. Zachary examined the ankle monitor removed from Defendant's ankle following his arrest and found "significant damage" and "gouge marks" on the plastic housing of the device as well as "wires hanging out that are not normally hanging out of a strap." The housing was compromised, leaving "a significant gap between the housing and the rest of the transmitter that is not normally there." She said that although photographs of Defendant wearing the device immediately following his arrest suggested that the monitor was secure, it was impossible to determine if the monitor was "too large or not from this angle." She said that proper fitting required the person "to be standing or have their foot on the ground." In her experience, it would be unusual for a person of Defendant's age, weight, and height to be fitted with a monitor "that large." She noted that the photographs did not show the damaged side of the monitor and said that in her "experience, if someone is able to slip it off their foot, they are also able to slip it back on their foot." She also said that the photographs did not show the portion of Defendant's skin that would have been damaged by slipping it over his foot. Consequently, she could not say with certainty that Defendant would not have been able to remove the device.

Based upon this evidence, the jury convicted Defendant as charged. Following a sentencing hearing, the trial court imposed a sentence of life plus six years' incarceration. Defendant filed a timely but unsuccessful motion for new trial in which he challenged, among other things, the admission of the gang evidence and the sufficiency of the convicting evidence. A timely notice of appeal followed.

**Analysis**

On appeal, Defendant challenges the admission of evidence of his gang affiliation and the ongoing war between the Ghost Mob and the Hoover Crips. He also challenges the sufficiency of the convicting evidence.

## I. Gang Evidence

Defendant makes two related arguments about the admission of gang evidence in this case: (1) the trial court erred by admitting Investigator Robertson's expert testimony about gang rivalries and retaliatory shootings and (2) the trial court erred by admitting evidence of Defendant's association with known gang members. The State contends that the trial court did not err by admitting any of the challenged evidence. In the alternative, the State asserts that even if the trial court erred by admitting the evidence, the error was harmless given the other evidence of Defendant's guilt.

As indicated, at the hearing on the State's motion to admit the challenged evidence, the trial court deemed Investigator Robertson qualified by training and experience to testify "as an expert in the area of gangs and the Crips and the Vice Lords, Ghosts." The court further found that the testimony was relevant to establish identity, motive, and premeditation as well as to "complete the story of . . the State's theory of the case" but said that it would provide a targeted limiting instruction to insure that the jury did not use the evidence for an improper purpose. Similarly, the court concluded that the video recording was admissible because it showed Defendant handling the murder weapon only hours before the shooting and claiming membership in the Ghost Mob. Finally, the court determined that the State would be permitted to admit evidence that Defendant was arrested in the company of Tipler only weeks before the shooting. Notably, the trial court excluded the testimony of Mr. Reed about the carving at the detention center.

### A. *General Principles*

Certain general principles pertain to both of Defendant's challenges. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may be still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," Tenn. R. Evid. 403.

Generally speaking, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Tenn. R. Evid. 404(a). This rule is subject to certain exceptions, however, including "evidence of a pertinent trait of character offered by an accused or by the

prosecution to rebut the same." Tenn. R. Evid. 404(a)(1). In addition, "[e]vidence of other crimes, wrongs, or acts" may be admissible for "other purposes," such as proving identity, criminal intent, or rebuttal of accident or mistake. Tenn. R. Evid. 404(b); *State v. Thacker*, 164 S.W.3d 208, 239-40 (Tenn. 2005). To admit such evidence, the rule specifies four prerequisites:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). When the trial court substantially complies with the requirements of Rule 404(b), we review that court's ruling for an abuse of discretion. *See Thacker*, 164 S.W.3d at 240. "[I]n view of the strict procedural requirements of Rule 404(b)," however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

This court has previously concluded that evidence of gang affiliation is character evidence subject to review under the terms of Rule 404(b). *See State v. Sims*, No. E2018-01268-CCA-R3-CD, 2020 WL 5088737, at *7 (Tenn. Crim. App. Aug. 28, 2020) (first citing *State v. Jackson*, No. E2014-01387-CCA-R3-CD, 2015 WL 6756318, at *9 (Tenn. Crim. App. Nov. 5, 2015); and then *State v. Crayton*, No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3 (Tenn. Crim. App. June 27, 2001)); *see also, e.g.*, *State v. Brewer*, No. E2010-01147-CCA-R3-CD, 2011 WL 2732566, at *17 (Tenn. Crim. App. July 14, 2011); *State v. Mathis*, No. W2005-02903-CCA-R3-CD, 2007 WL 2120190, at *9 (Tenn. Crim. App. July 20, 2007); *State v. Gardner*, No. W2002-00607-CCA-R3-CD, 2003 WL 21488004, at *9 (Tenn. Crim. App. June 26, 2003).

### B. Gang Affiliation

Defendant argues that the trial court erred by admitting evidence of his affiliation with the Ghost Mob because it was irrelevant and unfairly prejudicial. The State asserts that the trial court did not err.

Contrary to Defendant's assertion, the trial court substantially complied with the requirements of Rule 404(b). Accordingly, we review the admission of Defendant's gang

affiliation for an abuse of discretion. The trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006), *overruled on other grounds by State v. Patterson*, 564 S.W.3d 423 (Tenn. 2018) (citation omitted).

Here, the video recording taken from Defendant's cell phone featured Defendant stating that he was "with them Ghosties" and wearing a shirt featuring the murdered leader of the Ghost Mob. The video also featured known Ghost Mob member Anderson. Additionally, Defendant was arrested only weeks before the shooting in the company of Tipler, the leader of the Ghost Mob in Jackson. Defendant argues that this evidence was not clear and convincing proof of his gang affiliation because the State did not present "a gang validation form," but no such form is a prerequisite to the admission of evidence of gang affiliation. In our view, the evidence of Defendant's gang affiliation was clear and convincing.

Furthermore, the trial court did not abuse its discretion by concluding that evidence of Defendant's gang affiliation and his association with known gang members was relevant to the issues of identity and motive as well as to provide important context for the shootings. That Defendant was arrested in the company of Tipler, who had a history of recruiting minors into the gang and directing them to commit crimes, considered along with evidence of the ongoing feud between the Ghost Mob and the Hoover Crips, was highly probative of Defendant's identity as the shooter as well as his motive for the shooting. *See, e.g.*, *State v. Lester*, No. E2017-02154-CCA-R3-CD, 2018 WL 6498700, at *13 (Tenn. Crim. App. Dec. 10, 2018) (trial court properly admitted evidence of gang affiliation "to establish Defendant's identity and his relationship with the other parties"). This is true even though neither of the victims was a gang member because they were shot as they sat at the home of a known member of the Hoover Crips. The victims were not shot at a neutral location.

Finally, although this evidence was certainly prejudicial to Defendant, the danger of unfair prejudice did not outweigh the probative value of the evidence. That is, the evidence did not encourage the jury to convict Defendant based on an improper basis. This is particularly true given that trial court instructed the jury that it could "not consider" evidence of Defendant's gang affiliation "to prove his disposition to commit the crime" but could only consider it "for the limited purpose of determining whether" the gang-related evidence provided "[t]he complete story of the crime"; Defendant's "identity in the case on trial"; and motive "for the commission of the offense presently charged."

### C. Investigator Robertson's Testimony

Defendant argues that the trial court erred by admitting Investigator Robertson's testimony because the State failed to establish a connection between the larger gang rivalry

12

and the shooting in this case, because the State failed to establish that there was a retaliatory motive in this case, and because neither of the victims was in a gang. Defendant asserts that, considering these failings, the investigator's testimony did not substantially assist the jury.

As an initial matter, we note that despite its references to gang activities, Investigator Robertson's testimony about the history of retaliatory violence between the Ghost Mob and the Hoover Crips as well as Tipler's activities in recruiting minors into the Ghost Mob did not "involve any alleged conduct by the defendant, and, consequently, Rule 404(b) does not apply." *Snipes*, 2021 WL 4523074, at *10 (citing *State v. DuBose*, 953 S.W.2d 649, 653 (Tenn. 1997)). Accordingly, our review is limited to the admissibility of this evidence under the general rule of relevance and the rules for the admission of expert testimony.

Trial courts, acting as gatekeepers to the admissibility of expert testimony, must "ensure that 'an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *State v. Scott*, 275 S.W.3d 395, 401-02 (Tenn. 2009) (quoting *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 275 (Tenn.2005)). To this end, the court "must assure itself that the [expert's] opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation." *Id.* (quoting *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997)) (alteration in *Scott*). "The court's reliability analysis has four general inter-related components: (1) qualifications assessment, (2) analytical cohesion, (3) methodological reliability, and (4) foundational reliability." *Id.* "Importantly, though, these different descriptions are merely variations on the essential theme: 'the reliability of the testimony and whether it provides substantial assistance to the jury serve as the essential guidelines for the determination of admissibility." *State v. Gardner*, 716 S.W.3d 388, 411 (Tenn. Crim. App. 2024), *perm. app. denied* (Tenn. May 23, 2025) (quoting *Payne v. CSX Transp., Inc.*, 467 S.W.3d 413, 455 (Tenn. 2015)).

The party proffering expert testimony need not establish that the expert testimony is correct, only that the expert testimony "rests upon 'good grounds.'" *Scott*, 275 S.W.3d at 402 (quoting *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)). "In considering whether good grounds underlie the expert testimony, the trial court is assessing whether the 'proposed expert testimony meets the levels of relevance and reliability established in Tenn. R. Evid. 702 & 703.'" *Id.* (quoting *Pullum v. Robinette*, 174 S.W.3d 124, 134 (Tenn. Ct. App. 2004)). Rule 702 addresses the need for expert testimony and the qualifications of the expert: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Rule 703 focuses on the reliability of expert opinion testimony:

13

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703. The admissibility of expert testimony is a matter entrusted to the sound discretion of the trial court, and there can be no reversal on appeal absent clear abuse of that discretion. *See Scott*, 275 S.W.3d 395, 404 (Tenn. 2009); *see also State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Scott*, 275 S.W.3d at 404 (citing *Konvalinka v. Chattanooga–Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)).

Defendant did not challenge Investigator Robertson's qualifications for certification as an expert at trial, and he does not do so on appeal. "After determining whether the witness was qualified to testify as an expert, the next step in the analysis is to determine whether the expert's opinion is relevant and helpful to the trier of fact." *Gardner*, 716 S.W.3d at 411 (Tenn. Crim. App. 2024), *perm. app. denied* (Tenn. May 23, 2025) (citing *State v. Bonds*, 502 S.W.3d 118, 141 (Tenn. Crim. App. 2016)).

Defendant asserts that the investigator's testimony was neither relevant nor helpful to the jury because the State failed to establish a connection between the general pattern of violence between the Ghost Mob and the Hoover Crips because neither of the victims were gang members. Defendant's argument overlooks the fact that although neither victim was a gang member, both were shot in the driveway of the home of a known Hoover Crip. The location of the shooting, viewed through the lens of Defendant's affiliation with the Ghost Mob, connects the history of violence between the two gangs and the shooting in this case. That history it made it more likely that Defendant, a member of the Ghost Mob, would shoot two men at the home of a known Hoover Crip. The generalized nature of the feud supported the State's theory that Defendant shot the victims because he meant to shoot *any* Hoover Crip.

Defendant also argues that Investigator Robertson's testimony lacked trustworthiness "because it was not based on objective facts." However, Rule 703 permits an expert witness to base "an opinion or inference" on "facts or data" " perceived by or

made known to the expert at or before the hearing." Tenn. R. Evid. 703. Furthermore, our supreme court has observed that the trial court "may conclude that an expert's opinions are reliable if the expert's conclusions are sufficiently straightforward and supported by a rational explanation which reasonable [persons] could accept as more correct than not correct." *Brown*, 181 S.W.3d at 275 (citations and internal quotation marks omitted) (alteration in *Brown*). Here, Investigator Robertson testified directly from his extensive personal knowledge and experience about the pattern of retaliatory violence between the Ghost Mob and the Hoover Crips. The courts of this state have previously recognized the admissibility of such testimony. *See Bonds*, 502 S.W.3d at 143-44 (trial court did not err by admitting expert testimony "in the field of gang identification"); *see also State v. Byars*, No. W2016-00005-CCA-R3-CD, 2017 WL 758517, at *12 (Tenn. Crim. App. Feb. 27, 2017), *overruled on other grounds by State v. Minor*, 546 S.W.3d 59 (Tenn. 2018) (stating that "it is clear that gang activity is a recognized area of expertise" (first citing *Mathis*, 2007 WL 2120190, at *9; and then *Jackson v. State*, 197 S.W.3d 468, 471 (Ark. 2004); and then *People v. Williams*, 753 N.E.2d 1089, 1094 (Ill. App. Ct. 2001); and then *State v. Montea Wilson*, No. W2000-00748-CCA-R3-CD, 2002 WL 925255 (Tenn. Crim. App. May 3, 2002)). Consequently, the trial court did not err by admitting Investigator Robertson's testimony.

In sum, we conclude that the trial court did not abuse its discretion by admitting evidence of Defendant's gang affiliation or of the larger pattern of retaliatory gang violence between the Ghost Mob and the Hoover Crips.

## II. Sufficiency of the Evidence

Defendant claims that the evidence was insufficient to support any of his convictions because the State failed to establish beyond a reasonable doubt his identity as the perpetrator. The State avers that the evidence was sufficient.

We review a challenge to the sufficiency of the convicting evidence to determine whether, "after viewing the evidence in the light most favorable to the prosecution" and providing the State with "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom," "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citations omitted); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citations omitted); Tenn. R. App. P. 13. Our review "is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)). Importantly, a guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal, shifting the burden to the defendant to demonstrate why the evidence is legally insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

We must decline any invitation to revisit witness credibility or any purported discrepancies in the evidence because the jury, not this court, resolves all questions involving the credibility of the witnesses, the weight and value to be given to evidence, and the factual disputes raised by such evidence. *See Dorantes*, 331 S.W.3d at 379 (citing *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). Accordingly, this court will neither re-weigh nor reconsider the evidence when evaluating the sufficiency of the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

As charged in this case, "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally for purposes of Code section 39-13-202(a)(1) "when it is the person's conscious objective or desire to cause the death of the alleged victim." *State v. Reynolds*, 635 S.W.3d 893, 915 (Tenn. 2021) (citing Tenn. Code Ann. § 39-11-302(a) (2018)). As used in the statute, "[p]remeditation 'is an act done after the exercise of reflection and judgment.'" Tenn. Code Ann. § 39-13-202(e). Although "'[p]remeditation' means that the intent to kill must have been formed prior to the act itself," the State need not establish "that the purpose to kill preexist[ed] in the mind of the accused for any definite period of time." *Id.*

Whether premeditation exists is a question of fact for the jury "which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see also Reynolds*, 635 S.W.3d at 916. The Tennessee Supreme Court has identified a non-exhaustive list of specific circumstances that suggest the existence of premeditation:

> (1) The use of a deadly weapon on an unarmed victim;
>
> (2) The particular cruelty of the killing;
>
> (3) Threats or declarations of the intent to kill;
>
> (4) The procurement of a weapon;
>
> (5) Any preparations to conceal the crime undertaken before the crime was committed;
>
> (6) The destruction or secretion of evidence of the killing;
>
> (7) Calmness after the killing;
>
> (8) Evidence of motive;
>
> (9) The use of multiple weapons in succession;
>
> (10) The infliction of multiple wounds or repeated blows;

(11) Evidence that the victim was retreating or attempting to escape when killed;

(12) The lack of provocation on the part of the victim; and

(13) The failure to render aid to the victim.

*Reynolds*, 635 S.W.3d at 916-17 (citations omitted). The jury, as the trier of fact, "is not limited to any specific evidence when determining whether a defendant intentionally killed the victim 'after the exercise of reflection and judgment.'" *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003) (quoting Tenn. Code Ann. § 39-13-202(d) (current version at Tenn. Code Ann. § 39-13-202(e)). Thus, premeditation "may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment.'" *State v. Leach*, 148 S.W.3d 42, 53 (Tenn. 2004) (quoting Tenn. Code Ann. § 39-13-202(d) (current version at Tenn. Code Ann. § 39-13-202(e)).

As charged in this case "[a] person commits criminal attempt who, acting with" the same culpability required for the charged offense "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3).

"A person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101, and the assault . . . [i]nvolved the use or display of a deadly weapon." Tenn. Code Ann. § 39-13-102(a)(1)(A)(iii). "A person commits assault who intentionally or knowingly " causes bodily injury to another." *Id.* § 39-13-101(a)(1). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." *Id.* § 39-11-106(3). "Deadly weapon" means . . . [f]irearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or . . . [a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 39-11-106(6). A firearm is "[a]ny weapon that will or is designed to or may readily be converted to expel a projectile by the action of an explosive." *Id.* § 39-11-106(13).

"It is an offense to employ a firearm or antique firearm during" the "[c]ommission of" or "attempt to commit a dangerous felony." *Id.* § 39-17-1324(b)(1)-(2). Attempted first degree murder is a dangerous felony. *Id.* § 39-17-1324(i)(1)(A), (BB).

In addition to the statutory elements, "[i]t is well established that the identity of the perpetrator is an essential element of any crime." *State v. Miller*, 638 S.W.3d 136, 158 (Tenn. 2021) (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006), *abrogated in part by Dorantes*, 331 S.W. 3d at 381). "Identity may be established by circumstantial evidence

17

alone. *Id.* (citing *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002)). Whether the State has established the defendant as the perpetrator of the charged offenses beyond a reasonable doubt is "a question of fact for the jury upon its consideration of all competent proof." *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015) (citations omitted); *Miller*, 638 S.W.3d at 158 (observing that direct and circumstantial evidence of identity is reviewed under the standard announced in *Dorantes*).

As stated above, Defendant's challenge to the sufficiency of the evidence is to his identity as the shooter. In the light most favorable to the State, the evidence established that Messrs. Felton and Wright were shot by a young, thin person wearing a black hoodie despite the heat as they sat in front of the residence of known Hoover Crip Lavon Lake, which was located approximately 100 yards from Defendant's residence. Mr. Felton was struck numerous times, including in the face. Mr. Wright was shot in the elbow, permanently injuring him. On the day of the shooting, Defendant made a social media post showing himself and known Ghost Mob member Anderson wearing gang paraphernalia, throwing gang signs, and using language that affirmed their membership in the Ghost Mob as well as suggested an intent to commit a drive-by shooting or kill Hoover Crips. Most importantly, however, the video featured Defendant brandishing the firearm that was used to kill Mr. Felton and to wound Mr. Wright. Immediately after the shooting, canine officer Echo tracked from the spent shell casings directly to the firearm where it lay in the kudzu in the backyard of Defendant's residence. After locating the firearm, Echo tracked the same scent to the back door of the residence. Inside, officers found a black hoodie matching the description of that worn by the perpetrator, and forensic microanalysis established the presence of gunshot residue on the hoodie. Testing also established the presence of gunshot residue on Defendant's hands and shorts shortly after the shooting. Although Defendant claimed that his wearing an ankle monitor provided him with an alibi for the time of the shooting, the evidence clearly established that Defendant's ankle monitor had been significantly damaged. Gouge marks on the housing of the monitor matched a screwdriver found in Defendant's residence, and the jail recording established that Defendant asked a woman to get the tool that she had used for her ankle. Additionally, the evidence established that the monitoring company had been instructed to disregard tamper notifications from Defendant's device while he was at home because his monitor was "too big," a fact supported by Ms. Zachary's testimony that it would have been unusual for someone of Defendant's size to be fitted with such a large monitor. At 4:05 p.m., just two hours before the shooting, the monitoring company was instructed to ignore all further notifications from Defendant's ankle monitor. Following his arrest, Defendant denied that he knew Tipler despite that the two were arrested together only weeks before the shooting. The trial court provided the jury with instructions on both alibi and identity, and the jury, as was its prerogative, chose to convict. In our view, the evidence was sufficient to support Defendant's convictions.

## Conclusion

Based upon the foregoing, the judgment of the trial court is affirmed.

s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE
